2002 ME 64

**MAINE TAXPAYERS ACTION NETWORK**

v.

**SECRETARY OF STATE.**

Supreme Judicial Court of Maine.

Argued: April 4, 2002.
Decided: April 17, 2002.

Stephen C. Whiting (orally), the Whiting Law Firm, P.A., Portland, for plaintiff.

G. Steven Rowe, Attorney General, Phyllis Gardner, Asst. Attorney General (orally), Augusta, for defendant.

Panel: SAUFLEY, C.J., and CLIFFORD, RUDMAN, DANA, CALKINS, and LEVY, JJ.

SAUFLEY, C.J.

[¶ 1] Maine Taxpayers Action Network challenges the Secretary of State's decision to invalidate over three thousand signatures gathered by an imposter who was paid by MTAN to circulate petitions in support of a ballot initiative. The imposter, who, unbeknownst to MTAN, had stolen the identity of another person who did not reside in Maine, has now absconded from Maine and cannot be found.

[¶ 2] MTAN asks us to hold that when a circulator steals the identity, including name, social security number, and birth date, of another person, fraudulently obtains a driver's license, motor vehicle registration, and voter registration using that stolen identity, and falsely swears to that identity in his oath and affidavit in connection with an initiative petition, the Secretary of State must nonetheless accept the signatures obtained by that circulator. We are unpersuaded by MTAN's argument, and we affirm the judgment of the Superior Court affirming the decision of the Secretary of State.

## I. BACKGROUND

[¶ 3] In October of 2000, with the approval of the Secretary of State pursuant to constitutional and statutory citizen initiative procedures, the Maine Taxpayers Action Network initiated a petition on behalf of a proposed ballot initiative entitled "An Act to Impose Limits on Real and Personal Property Taxes." *See* ME. CONST. art. IV, pt. 3, § 18;[1] 21-A M.R.S.A. §§ 901–906 (1993 & Supp.2001). The citizen initiative procedures permit Maine citizens to propose legislation directly to the Legislature after obtaining the requisite number of signatures on a petition. ME. CONST. art. IV, pt. 3, §§ 18(2), 20; 21-A M.R.S.A. § 901 (Supp.2001). In this case, MTAN was required to gather 42,101 signatures to support its initiative.

---

1. The *Maine Constitution* provides, in pertinent part:

**§ 18. Direct initiative of legislation**
Section 18
**1. Petition procedure.** The electors may propose to the Legislature for its consideration any bill, resolve or resolution, including bills to amend or repeal emergency legislation but not an amendment of the State Constitution, by written petition addressed to the Legislature or to either branch thereof and filed in the office of the Secretary of State . . . .
**2. Referral to electors unless enacted by the Legislature without change; number of signatures necessary on direct initiative petitions; dating signatures on petitions; competing measures.** For any measure thus proposed by electors, the number of signatures shall not be less than 10% of the total vote for Governor cast in the last gubernatorial election preceding the filing of such petition. The date each signature was made shall be written next to the signature on the petition, and no signature older than one year from the written date on the petition shall be valid. The measure thus proposed, unless enacted without change by the Legislature at the session at which it is presented, shall be submitted to the electors together with any amended form, substitute, or recommendation of the Legislature, and in such manner that the people can choose between the competing measures or reject both. . . .
ME. CONST. art. IV, pt. 3, § 18.

[¶ 4] Signatures are collected by individuals known as "circulators." ME. CONST. art. IV, pt. 3, § 20.[2] Of the 53,795 signatures collected by MTAN, 3054 of them were obtained by a circulator known as James Powell. Pursuant to ME. CONST. art. IV, pt. 3, § 20, and 21–A M.R.S.A. §§ 354(3), (4), (7),[3] 902 (1993 & Supp.2001), the man purporting to be James Powell swore to the following oath after collecting the signatures:

I hereby make oath that I am the Circulator of this petition, that all signatures to this petition were made in my presence and, to the best of my knowledge and belief, each signature is that of the person it purports to be.[4]

The circulator known as James Powell was, however, an imposter who had stolen the identity of the real James Powell, a man living in the state of Washington. The circulator used the real James Powell's name, social security number, and birth date and place as his own to fraudulently obtain a driver's license, motor vehicle registration, and voter registration. The real identity of the person posing as James Powell is unknown. The imposter at some point left the state and could not be located by investigators.

[¶ 5] The Secretary of State invalidated 14,506 of MTAN's signatures. Included with the invalidated signatures are the 3054 collected by the purported James Powell that were rejected because the circulator posing as Powell was not a resident of Maine and was not the person he pur-

---

2. Section 20 provides, in pertinent part:

§ 20. Meaning of words "electors," "people," "recess of Legislature," "state-wide election," "measure," and "written petition"; written petitions for people's veto; petitions for direct initiative

Section 20. As used in any of the 3 preceding sections or in this section the word "electors" and "people" mean the electors of the State qualified to vote for Governor; ... *"circulator" means a person who solicits signatures for written petitions, and who must be a resident of this State and whose name must appear on the voting list of the city, town or plantation of the circulator's residence as qualified to vote for Governor;* "written petition" means one or more signatures written or printed, or partly written and partly printed, with the original signatures of the petitioners attached, *verified as to the authenticity of the signatures by the oath of the circulator that all of the signatures to the petition were made in the presence of the circulator and that to the best of the circulator's knowledge and belief each signature is the signature of the person whose name it purports to be,* and accompanied by the certificate of the official authorized by law to maintain the voting list of the city, town or plantation in which the petitioners reside that their names appear on the voting list of the city, town or plantation of the official as qualified to vote for Governor. *The oath of the circulator must be sworn to in the presence of a person authorized by law to administer oaths....* ME. CONST. art. IV, pt. 3, § 20 (emphasis added).

3. Title 21–A section 354(7)(A) requires:

The circulator of [an initiative] petition shall verify by oath or affirmation before a notary public or other person authorized by law to administer oaths that all of the signatures to the petition were made in his presence and that to the best of his knowledge and belief each signature is the signature of the person whose name it purports to be and each person is a resident of the electoral division named in the petition. 21–A M.R.S.A. § 354(7)(A) (1993).

4. The term "oath" is defined as "[a] solemn declaration, accompanied by a swearing to God or a revered person or thing, that one's statement is true or that one will be bound to a promise." BLACK'S LAW DICTIONARY 1099 (7th Ed.1999). Strictly speaking, the lack of a swearing to God or a revered person or thing means that the "oath" taken by the circulator here was really an affirmation, but there is no contention that this distinction makes a difference under the Maine Constitution or the relevant statutes. *Cf. id.* at 59 (defining "affirmation" as "[a] pledge equivalent to an oath but without a reference to a supreme being or to 'swearing' ").

ported to be. *See* 21–A M.R.S.A. § 905 (1993 & Supp.2001). This left MTAN 2812 signatures short of the required 42,101.

[¶ 6] MTAN filed a petition for review of the Secretary's decision in the Superior Court pursuant to 21–A M.R.S.A. § 905(2) (1993). Following a joint motion by the parties, the Superior Court (Cumberland County, *Humphrey, J.*) remanded the matter to the Secretary for the taking of additional evidence. The Secretary then issued a decision giving three grounds for invalidating the 3054 signatures: (1) the circulator using the name of James Powell had sworn to a false identity and was, therefore, not who he purported to be according to his oath; (2) the circulator had used a false identity in registering to vote himself, and was therefore not a properly registered voter in violation of ME. CONST. art. IV, pt. 3, § 20 and 21–A M.R.S.A. § 903–A (Supp.2001); and (3) the circulator was not a bona fide resident of Maine in violation of ME. CONST. art. IV, pt. 3, § 20. The Superior Court did not reach the issue of whether the person acting as Powell was a registered voter, but upheld the Secretary's decision to invalidate the signatures on the grounds that he was not a resident of Maine and that he falsely stated his identity in his oath on petition documents. MTAN appeals pursuant to 21–A M.R.S.A. § 905(3) (1993).[5]

## II. DISCUSSION

### A. Standard of Review

[¶ 7] "We review the decision of the Secretary of State directly, reviewing for abuse of discretion, errors of law, or findings not supported by evidence." *Palesky v. Sec'y of State*, 1998 ME 103, ¶ 9, 711 A.2d 129, 132 (citation omitted). MTAN does not challenge the Secretary's factual findings regarding the wholly false identity used by the alleged James Powell. It contends, however, that requiring a circulator to actually be who he purports to be, and requiring that a circulator be a registered voter and resident of this state, place an undue burden on the political process in contravention of the First Amendment applied through the Fourteenth Amendment to the United States Constitution.[6] *See* U.S. CONST. amends. I, XIV, § 1.

[¶ 8] The circulation of direct initiative petitions is "core political speech," and any state regulation of the initiative process must be "narrowly tailored" to carry out a compelling state purpose. *Wyman v. Sec'y of State*, 625 A.2d 307, 311 (Me.1993); *Hart v. Sec'y of State*, 1998 ME 189, ¶ 9, 715 A.2d 165, 167–68, *cert. denied* 525 U.S. 1139, 119 S.Ct. 1028, 143 L.Ed.2d 38 (1999). We are also cognizant, as the United States Supreme Court has stated, that, "as a practical matter, there must be a substantial regulation of elections if they are to be fair and honest and if some sort of order, rather than chaos, is to accompa-

**5.** MTAN limits its appeal to the Secretary's invalidation of the 3054 signatures collected by the imposter, and does not challenge the invalidation of the remaining 11,452 signatures.

**6.** MTAN also contends that Maine's requirement that circulators be registered voters and residents of Maine violates its First Amendment right of free speech. *See* U.S. CONST. amends. I, XIV, § 1. *But see Hart v. Sec'y of State*, 1998 ME 189, ¶ 13, 715 A.2d 165, 168,

*cert. denied* 525 U.S. 1139, 119 S.Ct. 1028, 143 L.Ed.2d 38 (1999) (concluding that Maine's residency requirement did not violate the constitutional right to free speech). *See also Initiative & Referendum Inst. v. Jaeger*, 241 F.3d 614 (8th Cir.2001). Because we affirm the Secretary's decision on other grounds, it is unnecessary to address MTAN's challenges to the constitutional requirement that circulators must be residents and registered voters.

ny the democratic processes." *Storer v. Brown*, 415 U.S. 724, 730, 94 S.Ct. 1274, 39 L.Ed.2d 714 (1974). Accordingly, there is no litmus test for determining whether an election regulation imposes an impermissible burden on free speech, and states are accorded considerable leeway in the regulation of the initiative process in order to promote their legitimate state purposes. *Buckley v. American Constitutional Law Found., Inc.*, 525 U.S. 182, 192, 119 S.Ct. 636, 142 L.Ed.2d 599 (1999) (citing *Storer*, 415 U.S. at 730, 94 S.Ct. 1274). Because MTAN has challenged the constitutionality of the Secretary's evaluation of petitions collected by the imposter, we review the Secretary's actions de novo. *Town of Baldwin v. Carter*, 2002 ME 52, ¶ 8, 794 A.2d 62, 66; *see also Bose Corp. v. Consumers Union of United States, Inc.*, 466 U.S. 485, 508 n. 27, 104 S.Ct. 1949, 80 L.Ed.2d 502 (1984).

B. History and Petition Process

[¶ 9] The citizens' initiative provisions of the Maine Constitution, ME. CONST. art. IV, pt. 3, § 18, were enacted in 1907. Resolves 1907, ch. 121. Although section 18 provides the framework for the petition procedure, *see supra* note 1, it is section 20 alone that outlines the procedure for the circulation of those petitions and the collection of signatures. ME. CONST. art. IV, pt. 3, § 20; *see supra* note 2.

[¶ 10] The initiative provisions of the Maine Constitution also grant the Maine Legislature the authority to carry out those constitutional mandates through legislation. The Legislature has exercised

that authority by delineating the procedure by which a party may introduce an initiative. 21–A M.R.S.A. § 901 (Supp. 2001). The party must first, as MTAN did, submit an application with the text of the proposed law to the Secretary. *Id.* The Secretary then reviews and approves the petition form prior to its circulation. *Id.*

[¶ 11] Circulators then proceed to collect the requisite number of signatures. A voter who wishes to support the initiative first signs his or her name to the petition, and either the voter or the circulator then prints the voter's name and address. 21–A M.R.S.A. § 354(3), (4) (1993 & Supp. 2001). After collecting the signatures, the circulator must take an oath before a notary public certifying that he is the circulator and that all signatures on the petition are those of whom they purport to be. ME. CONST. art. IV, pt. 3, § 20; 21–A M.R.S.A. § 354(7), 902 (1993 & Supp.2001). The registrar of each municipality then certifies that the names appearing on the petitions also appear on the list of registered voters in that municipality. 21–A M.R.S.A. § 354(7)(C) (Supp.2001); *see also id.* § 902.

C. Secretary of State's Authority

[¶ 12] The Secretary is vested with the authority to determine whether any petition filed in support of a citizens initiative is valid. 21–A M.R.S.A. § 905(1) (Supp.2001).[7] The statute does not provide specific grounds for invalidating a signature, but provides broadly that "[t]he

7. Section 905(1) provides:
   The Secretary of State shall review all petitions filed in the Department of the Secretary of State ... for a direct initiative under the Constitution of Maine, Article IV, Part Third, Section 18.
   The Secretary of State shall determine the validity of the petition and issue a writ-

ten decision stating the reasons for the decision within 30 days after the final date for filing the petitions in the Department of the Secretary of State under the Maine Constitution of Maine, Article IV, Part Third, Section 17 or 18.
   21–A M.R.S.A. § 905(1) (Supp.2001).

Secretary of State shall determine the validity of the petition and issue a written decision stating the reasons for the decision . . . ." *Id.* Accordingly, we have recognized that the Secretary may disqualify signatures for a failure to follow the requirements of the Constitution or its statutory overlay. In *Hart*, for example, we held that the Secretary could invalidate signatures obtained by circulators who were not Maine residents. 1998 ME 189, ¶ 13, 715 A.2d at 168. Similarly, we have upheld the Secretary's invalidation of signatures not contained on approved petition forms and signatures lacking the certification of the registrar that the names appearing on the petition were registered voters of the community. *Palesky,* 1998 ME 103, ¶¶ 12–13, 711 A.2d at 133. Thus, it is well established that the Secretary has the authority to invalidate petitions *in toto* when the circulator has not complied with statutory or constitutional requirements.[8]

D. Analysis

▪ [¶ 13] From this context it is evident that the circulator's role in a citizens' initiative is pivotal. Indeed, the integrity of the initiative and referendum process in many ways hinges on the trustworthiness and veracity of the circulator. In reviewing the signatures gathered by the circulators, the Secretary has the ability to verify through municipal records that a signing voter is actually registered and therefore permitted to vote. In contrast, the Secretary has no way, without engaging in a separate investigation, to verify that a signing voter actually signed the petition. Thus, the circulator's oath is critical to the validation of a petition. Indeed, the oath is of such importance that the Constitution

requires that it be sworn in the presence of a notary public. Me. Const. art. IV, pt. 3, § 20; Const. Res.1975, ch. 2. The failure to sign the oath in the presence of the notary public is therefore an error of constitutional import, and we have held that failure to be fatal to an entire petition. *Palesky,* 1998 ME 103, ¶¶ 10–11, 711 A.2d at 132–33.

[¶ 14] We turn then to the question of whether the signing of an oath by an imposter may similarly justify the invalidation of the petition *in toto.* In addition to obtaining truthful information from the circulator, the oath is intended to assure that the circulator is impressed with the seriousness of his or her obligation to honesty, *see HCI Corp. v. Voikos Constr. Co.,* 581 A.2d 795, 798 (Me.1990), and to assure that the person taking the oath is clearly identified should questions arise regarding particular signatures, *cf. Buckley,* 525 U.S. at 196, 119 S.Ct. 636. As early as 1917, we held that verification of the signatures and the subsequent oath taken by the circulator is an "indispensable accompaniment[ ] of a valid petition," and, accordingly, that the invalidation of signatures lacking this prerequisite is necessary to preserve the integrity of the initiative and referendum process. *Opinion of the Justices,* 116 Me. 557, 569, 103 A. 761, 767 (1917); *see also Opinion of the Justices,* 132 Me. 523, 525, 174 A. 846, 847–48 (1934); *Opinion of the Justices,* 114 Me. 557, 568–74, 95 A. 869, 874–76 (1915). Thus, we are not persuaded by MTAN's contentions that there is no requirement that the circulator be the person he purports to be.

[¶ 15] Nor are we convinced by MTAN's argument, relying on *McIntyre v. Ohio*

---

**8.** We have long recognized that the executive officer charged with overseeing the petition process—formerly the Governor, now the Secretary of State—has plenary power to investigate and determine the validity of petitions. *Opinion of the Justices,* 116 Me. 557, 580–82, 103 A. 761, 771–72 (1917).

*Elections Commission,* 514 U.S. 334, 115 S.Ct. 1511, 131 L.Ed.2d 426 (1995), that circulators have a First Amendment right to anonymity. Although in *McIntyre,* the United States Supreme Court did recognize that the protection of anonymity in certain political speech is a fundamental First Amendment requirement, that case involved an Ohio law requiring that political handbills identify the person or entity issuing the literature. 514 U.S. at 337–38, 357, 115 S.Ct. 1511. In contrast, this case involves the initiative and referendum procedure. Furthermore, in a later case the Court noted that the holding of *McIntyre* "left room" for affidavit and oath requirements for circulators of initiative petitions. *Buckley,* 525 U.S. at 200, 119 S.Ct. 636.

[¶ 16] In addition, MTAN's argument that, as long as the State is able to locate the circulator during the circulation process, the State cannot insist on further identification of the circulator or that the circulator remain in Maine after the completion of the circulation process, misunderstands the nature of our inquiry. There is no question that a circulator cannot be required to remain in the state. If the departing circulator has not engaged in identity fraud, however, the State is still likely to be able to find that person if inquiry regarding one or more signatures is necessary.

[¶ 17] In fact, the Legislature considers the circulator's swearing of the oath to be a sufficiently grave act that it has specifically criminalized the providing of a false statement in connection with a petition. 21–A M.R.S.A. § 904 (1993).[9] Section 904(3) provides that "[a] person who know-

ingly signs an initiative or referendum petition with any name other than his own," commits a Class E crime.

[¶ 18] In this case, there is no question that James Powell did not, in fact, circulate the petitions; rather, some unidentified individual posing as James Powell circulated the petitions. Thus, the oath containing the sworn statement that James Powell was the circulator for the petition is wholly inaccurate. The imposter did not merely use a nickname, or other authorized or legal alternative; instead, he used the full, stolen identity of another person. Indeed, his identity theft was so complete that his departure from the State of Maine left the Secretary and investigators from the Attorney General's Office completely unable to locate him. The Secretary might also have reasonably concluded that a person who has gone to such lengths to fraudulently, and perhaps criminally, conceal his own identity cannot be trusted with the crucial constitutional responsibility of honestly and faithfully obtaining signatures to a ballot initiative.

[¶ 19] The entire signature collection process is designed to allow citizens interested in changing the laws to obtain the support of other citizens, through their signatures, thus signalling sufficient support to trigger a statewide vote. If the circulator has provided a false identity, the veracity of his attestation to other matters is seriously in question, his status as a citizen and registered voter in this state, required by the constitution, become murky, and the ability of the Secretary of State to find him for purposes of inquiring

---

9. Other criminal sanctions could also apply. *See* 21–A M.R.S.A. § 159(1) (Supp.2001) (criminalizing the giving of a false statement or oath in connection with voter registration); 29–A M.R.S.A. § 2103 (1996 & Supp.2001) (regarding false statements on a driver's license application); 17–A M.R.S.A. § 452(1)(A) (1993) (criminalizing false swearing, that is, the making of a false statement under oath); *see also State v. Anthoine,* 2002 ME 22, ¶ 12, 789 A.2d 1277, 1280 (affirming false swearing conviction of petition circulator).

into any irregularity in signatures contained on his petition becomes difficult or impossible. *See, e.g., Buckley,* 525 U.S. at 196, 119 S.Ct. 636; *see also Hart,* 1998 ME 189, ¶ 13, 715 A.2d at 168 (noting that the purpose of the residency requirement is to make circulators easier to locate "if there is a question as to the validity of the signatures collected"). The depth of "James Powell's" identity fraud calls each of those purposes into question.

[¶ 20] We agree with the Secretary, then, that requiring circulators to correctly identify themselves in their oath and affidavit is narrowly tailored to carry out the state's reasonable interest in locating circulators within or without the state's borders. *See, e.g., Burdick v. Takushi,* 504 U.S. 428, 434, 112 S.Ct. 2059, 119 L.Ed.2d 245 (1992) (stating that when "a state election law provision imposes only 'reasonable, nondiscriminatory restrictions' upon the First and Fourteenth Amendment rights of voters, 'the State's important regulatory interests are generally sufficient to justify' the restrictions" (quoting *Anderson v. Celebrezze,* 460 U.S. 780, 788, 103 S.Ct. 1564, 75 L.Ed.2d 547 (1983))).

[¶ 21] We conclude, therefore, that the Secretary had ample authority and reason to question the authenticity of the signatures obtained by the circulator posing as James Powell and ultimately to invalidate the petitions circulated by this imposter. Because we conclude that the Secretary of State did not err in determining the facts regarding the imposter's false identity, did not violate the constitutional rights of MTAN in requiring that a circulator be who he claims to be, and did not abuse his discretion in invalidating the 3054 signa-

tures based on the circulator's violation of the oath requirement, it is not necessary to address the Secretary's further finding that the signatures could be invalidated because the imposter was not a resident of Maine or a registered voter.

The entry is:

Judgment affirmed.

DANA, J., files an opinion concurring in the judgment.

DANA, J., concurring in the judgment.

[¶ 22] I concur in the result, but I would affirm the decision of the Secretary of State for a different reason:

[¶ 23] The Court upholds the disenfranchisement of over three thousand citizens as a sanction for "James Powell's" criminal conduct. The policy rationale for imposing such a sanction has a legislative ring. I reach the same result, however, because "James Powell" was not a "circulator" as that term is defined in the Maine Constitution.

[¶ 24] The Constitution requires that a circulator's "name must appear on the voting list of the city, town or plantation of the circulator's residence . . . ." Me. Const. art. IV, pt. 3, § 20. In the present case, the circulator fraudulently registered to vote as "James Powell." The circulator's actual name, which is currently unknown, does not "appear on the voting list" of the municipality of his residence, and, therefore, he is not a circulator pursuant to Me. Const. art. IV, pt. 3, § 20.

[¶ 25] MTAN contends that the registrar of the municipality is the "exclusive" authority on a voter's qualifications,[10] and,

---

10. Section 121 provides: "The registrar has the exclusive power, subject to section 163, to determine whether a person who applies for registration as a voter meets the qualifications prescribed by this Title." 21–A M.R.S.A. § 121 (Supp.2001). Section 161 also provides that "[t]he registrar has the exclusive power to prepare and revise the voting list." *Id.* § 161. Section 161(4) provides: "If the registrar is in doubt as to the qualifications of

therefore, the Secretary of State has no authority to determine whether "James Powell" was a properly registered voter.[11] The issue, however, is not whether a person named "James Powell" is a properly registered voter, but whether the *circulator's* "name" "appear[s] on the voting list of the city, town or plantation of the circulator's residence . . . ." ME. CONST. art. IV, pt. 3, § 20. Because the circulator (whose identity is unknown) did not register to vote using his correct name, his name did not appear on the voting list of his local community as required by the Constitution.

[¶ 26] MTAN contends that Maine's "registered voter" requirement violates the right to free speech as guaranteed by the First and Fourteenth Amendment. *See* U.S. CONST. amends. I, XIV, § 1. MTAN relies on the United States Supreme Court's decision in *Buckley v. American Constitutional Law Foundation, Inc.,* 525 U.S. 182, 197, 119 S.Ct. 636, 142 L.Ed.2d 599 (1999), in which the Court struck down a Colorado statute requiring circulators to be registered voters. As the Supreme Court stated, however, there is " 'no litmus paper test' [to] separate valid ballot-access provisions from invalid interactive speech restrictions . . . ." *Id.* at 192, 119 S.Ct. 636 (quoting *Storer v. Brown,* 415 U.S. 724, 730, 94 S.Ct. 1274, 39 L.Ed.2d 714 (1974)). The Court has also stated:

Decision in this context, as in others, is very much a 'matter of degree,' very much a matter of 'consider[ing] the facts and circumstances behind the law, the interests which the State claims to be protecting, and the interests of those who are disadvantaged by the classification. What the result of this process will be in any specific case may be very difficult to predict with great assurance.

*Storer,* 415 U.S. at 730, 94 S.Ct. 1274 (citations omitted).

[¶ 27] In *Buckley,* 525 U.S at 193, 119 S.Ct. 636, the Supreme Court considered the actual effect of the voter registration requirement in Colorado, in light of evidence in the record that there were at least 400,000, *id.,* and possibly as many as 964,000, *id.* at 193 n. 15, 119 S.Ct. 636, unregistered, but voter-eligible residents in Colorado at the time *Buckley* was decided. Based on this evidence, and "given the uncontested numbers," the Court found that Colorado's registered voter requirement "decreases the pool of potential circulators . . .," *id.* at 194, 119 S.Ct. 636, to an impermissible degree, and "cuts down the number of message carriers in the ballot-access arena without impelling cause," *id.* at 197, 119 S.Ct. 636.

[¶ 28] There is no evidence in the record to support the assertion that Maine's voter registration requirement will have a similar impact on the number of potential circulators as the Colorado requirement. Indeed, a recent decision by a federal court in Maine has upheld the Maine voter registration requirement against First Amendment and equal protection challenge, stating:

The Secretary [of State] in this case adduces undisputed evidence that the estimated voting-age population of Maine (*i.e.,* Maine residents age 18 and over) was 944,785 as of July 1997, com-

---

a person to vote, the registrar shall fix a reasonable time and place for a hearing and give written notice to the voter at the last known address provided by the voter . . . ." *Id.* § 161(4).

11. On the other hand, we have stated that "[f]raud opens all doors," *Opinion of the Justices,* 116 Me. 557, 581–82, 103 A. 761, 772 (1917), and that credible evidence of fraud may give the executive officer responsible for petition review the authority to make an independent investigation.

pared with a pool of Maine registered voters totalling 933,753 as of November 1998. Earlier data is comparable, showing a voting-age population of 943,797 in 1996 and a total of 953,368 registered voters as of November 1997. Thus, approximately 98.8 percent of Maine's voter-eligible population is registered to vote. These numbers do not in themselves sustain a claim of severe burden.

*Initiative & Referendum Inst. v. Sec'y of State*, No. CIV. 98–104–B–C, 1999 WL 33117172, at *15 (D.Me. Apr.23, 1999).[12]

[¶ 29] Maine's voter registration requirement serves a purpose of providing a convenient and administratively efficient means of identifying and locating circulators as part of the validation process, if necessary, or to investigate potential misconduct. *See id.* at *15–*16. In the absence of any evidence to suggest that Maine's voter registration requirement presents a severe burden on the right of free speech, I would uphold the voter registration requirement and affirm the Secretary of State's decision to invalidate the 3,054 signatures on the ground that the circulator's name does not appear on a list of registered voters as required by Me. Const. art. IV, pt. 3, § 20.

12. In an attached footnote, the District Court noted that "[t]he total number of registered voters appears to exceed the estimated voting-age population because local registrars do not always purge the names of registered voters who move or die." *Initiative & Referendum Inst. v. Sec'y of State*, No. CIV. 98–104–B–C, 1999 WL 33117172, at *15 n. 16 (D.Me. Apr.23, 1999).