DISSENTING OPINION OF JUSTICE LEEDS

STACY L. LEEDS, Justice.
This case involves a challenge to the sufficiency of an initiative petition. The proposed initiative seeks to place a constitutional amendment on the ballot at a special election. The amendment, if passed, will exclude a class of Cherokee citizens known as the Freedmen and invalidate the effect of this Court’s decision in Allen v. Cherokee Nation, JAT 04-09, 6 Am. Tribal Law 18, 2006 WL 5940403 (2006). There is no doubt that the Cherokee people have the legal right to amend the Constitution to redefine citizenship. The Cherokee people must, however, abide by Cherokee law in exercising that right.
In this initiative petition process, there are numerous irregularities, clear violations of Cherokee law, and it has been shown that some of the circulators perjured their sworn affidavits. I cannot, in good conscience, join in the majority opinion.
We must be concerned for the rights of two groups of Cherokee citizens. We must preserve the right of Cherokee citizens to propose constitutional amendments through the lawful initiative process. In doing so, we must also be cognizant of the rights of Cherokee citizens who stand to be excluded. The integrity of our democratic process is at stake.
The Challenges to the Petition
This Court is asked to invalidate the initiative petition on the following grounds:
(1) some individuals who circulated the petitions violated Cherokee law in their attempts to collect the required number of signatures;
(2) the petition is void on its face because it is vague and misleading;[1]
*45 (3) the petition violates the Constitution because the Cherokee people do not have the power to request a special election on an initiative petition;
(4) the action of the Principal Chief, in setting a special election for February 10, 2006, is unconstitutional because he lacks the power to call a special election for initiatives.
Cherokee Laws Governing Initiative Petitions
Article XV of the Constitution governs initiative, referendum, and constitutional amendments. The Tribal Council is thereby constitutionally required to enact procedures to govern the initiative and referendum process. In 2004, the Tribal Council passed “The Referendum and Initiative Procedures Act,” LA 15-04.
The Act sets forth mandatory procedures that must be followed in order to properly exercise the right of initiative. The Act includes criminal and civil sanctions for violations of the law and permits this Court to hear challenges. The legislation also requires this Court to set procedures for reviewing challenges.
The Act sets forth very basic requirements that are designed to guarantee that the process is fair and honest. The three most critical requirements to ensure integrity are:
(1)petitions must be assembled and circulated in a pamphlet containing an external warning page alerting individuals that it is a crime to sign another person’s name, to sign your own name twice, or to otherwise provide false information on the petition.
(2) petitions must be signed by registered Cherokee voters and the voter’s address and registration number must appear on the petition; and
(3) petition circulators must sign a sworn affidavit before a notary that they are a registered voter and that all signatures on each page were signed in their presence.
These simple requirements are not burdensome, nor do they impair the rights of the Cherokee people to advance initiatives. The requirements protect the initiative process against fraud, mistake and irregularities. These requirements create a presumption in favor of the proponents of the petitions. For this reason, we must presume the signatures are valid, and the burden falls on the challengers to prove otherwise. In the present case, the challenger has met that burden and introduced enough evidence to cause this Court to question the integrity of the process.
The Election Commission’s Report
The Election Commission is charged with counting the petitions and reporting the number of valid signatures to this Court. The Election Commission certified that 3,029 signatures appeared and that 2,217 signatures were valid. The Election Commission invalidated 812 signatures on the following grounds:
(1) the person was not registered to vote, or
(2) the person did not provide an address or registration number,[2] or
*46 (3) the person signed the petition twice, or
(4) the writing was illegible; or
(5) the signatures appeared on sheets that were not true and exact copies of the original petition filed with the election commission.[3]
The Election Commission’s review of the petitions wras very limited. The Election Commission did not remove any names that appear to be forged or names that wTere printed rather than signed. The Election Commission did not remove any petitions for improper circulator’s affidavits or for any impropriety in the way the pamphlets were assembled or circulated.
The Election Commission’s report reveals that there are 131 signatures in excess of what is required to place the initiative on the February ballot. Therefore, if more than 131 signatures should be excluded on the basis of this Court’s review', the initiative petition fails.
Supreme Court Review
LA 15-04 allows challenges to be brought before this Court. The legislation requires this Court to set procedures for reviewing petitions. To date, no procedures have been set. This Court accepted all the petition pamphlets into the eviden-tiary record for de novo review. This Court has a duty to review[7] the petition pamphlets.
Falsification of Affidavits
The challenger introduced evidence that some individuals who circulated the petitions violated Cherokee law by falsifying affidavits. The proponents offered no evidence to rebut this testimony. It was shown that twro of the circulators, Darren Buzzard and Dwayne Barrett, falsified petition affidavits. They violated the requirement that each circulator must swear before a notary that they personally witnessed all the signatures on a given petition. They swore before a notary that they personally circulated petitions that they did not in fact circulate. In doing so, they perjured themselves and their credibility as truthful circulators is impeached. This is particularly bothersome given the fact that Darren Buzzard attested to over 520 signatures.
Darren Buzzard and Dwayne Barrett falsified affidavits as follows:
1. John Summerfield testified that Harley Buzzard actually circulated the petition he and his wife signed, yet Darren Buzzard signed the affidavit that he personally witnessed each of the signatures. Darren Buzzard was not present when the signatures were collected. The petition was therefore falsely attested and must be discounted in its entirety.[4]
2. Carol Wyatt, an employee of Cherokee Nation Enterprises, testified that she is actually the person who carried a petition to her parents’ home to obtain their signatures. Dwayne Barrett signed the affidavit swearing that he was the person who witnessed all the signatures on that page. Dwayne Barrett was not present when the signatures were collected. The petition was *47 therefore falsely attested and must be discounted in its entirety.[5]
3. Melvin Gamer, who is not a Cherokee citizen, testified that he nonetheless signed the petition and that he also signed his wife’s name to the petition. Darren Buzzard was the circulator of this petition and once again he swore that he witnessed each person sign the petition, when in fact he did not. The petition was therefore falsely attested and must be discounted in its entirety.[6]
What is equally troubling, with respect to the integrity of the process, is that neither Carol Wyatt, John Summerfield, or Melvin Garner recalled seeing the required warning page on the external petitions pamphlets that were presented to them. Melvin Garner did not know that as a non-citizen, he was not allowed to sign the petition. He also was unaware that it was crime to sign someone else’s name to the petition. Viewed in the very best light, these testimonies suggest that the circula-tors did not assemble and circulate the petitions in the manner required by law. The testimony also shows that these two circulators were dishonest about their collection efforts. These are not inadvertent mistakes or mere technicalities this Court can overlook. These actions are conscious and deliberate and show a disregard for following the law.
In exercising their right of initiative, the voters and petition circulators must respect the laws enacted by the Council. The requirement that voters must sign the petition before a circulator, who then swears that the electors signed in his presence, is the most important requirement in preventing fraud and irregularity in the process. The falsification of affidavits is not a matter to be treated lightly. Election laws exist to preserve the integrity of our government and the Council thought this so important as to criminalize the falsification of initiative petitions.
The majority acknowledges that these individuals should be referred to the Attorney General for possible criminal prosecution for their fraudulent conduct. The majority is nonetheless willing to presume that these individuals were truthful in gathering the remaining signatures and attesting to the rest of the affidavits.
Presumptions of Signature Validity
In giving the full effect to the initiative power of the Cherokee people, I agree that we must first presume that the signatures verified by the Election Commission are valid. The party that challenges the initiative process has the burden to show that the initiative petition should be invalidated. Once it is proven that either fraud or irregularities have occurred, the burden must then shift to the proponents of the petition to revive the signatures as valid and to rehabilitate the credibility of certain circulators.[7]
In the present case, it has been proven that two of the circulators have filed false *48 affidavits. It. has been shown that Darren Buzzard falsified an affidavit on more than one occasion. This type of misconduct calls into question the verity of all the petitions that were carried by Darren Buzzard. The burden must shift to the proponents to show why the remaining signatures he allegedly collected should be counted.
A sworn statement before a notary is an oath that carries considerable weight. It is akin to the oath taken by witnesses who testify before this Court. If a witness is proven to have lied to this Court, the credibility of that particularly witness is Impeached. This is magnified when it is shown that the witness has lied to this Court more than once. We would no longer presume the witness to be trustworthy. The credibility of the circulators of a petition should be equally judged.
There is no Cherokee precedent for what a Court should do in this situation. Should the Court only disallow the signatures on the actual petitions that were specifically referenced at trial? Should the repeated falsification of circulator’s affidavits lead to the disallowance of all the signatures gathered by that circulator on the grounds that he cannot be trusted?
A review of the various state court cases offers several possible remedies. Some states would disallow only those signatures on the pages attached to the proven false affidavits. Those states would require specific testimony as to every single false affidavit, which in the case of Darren Buzzard, would have required the challenger to present at least 40 more witnesses to testify to the same conduct. Other states have disallowed all the signatures verified by one circulator where it has been shown that the circulator has falsified affidavits.[8] These courts reason that a circulator is in a position of trust. The circulator, as the witness to signatures, is the only person who can guarantee that the laws are followed. A circulator who is shown to have falsified affidavits has breached that trust.[9]
Other states have gone so far as to invalidate all the signatures associated with an entire group of circulators where a pattern of false affidavits and other irregularities has been established.[10] In those cases, it was not necessary to show that each and every circulator actually falsified all the affidavits. It was enough to show that a few circulators falsified some affidavits and that a pattern of fraud existed so as to taint the whole process.
Disallowed Signatures
Even if we adopt Oklahoma law as persuasive authority, as the majority urges, *49 this Court is required to exclude the entire pamphlet where it is shown that the affidavit is falsified by the circulator.[11] This would require that all the signatures that appear on the specific petitions carried by Darren Buzzard and Dwayne Barrett, as testified to at the hearing, must be excluded. This would require the exclusion of 31 signatures.[12]
Darren Buzzard swears to have personally obtained over 520 signatures. He has signed and attested to over seventeen percent of the total signatures collected in this process. Knowing that a circulator, who purportedly obtained more than 1 in every 6 signatures, has falsified at least some of his affidavits should give the Court great pause.
Upon review of the original petitions submitted by Darren Buzzard, the following additional irregularities and violations of law are found:
1. Volume 3, petition 37. 17 additional signatures must be disallowed because Darren Buzzard did not affix his signature to this affidavit at all. The lack of a circulator’s signature means that no one is attesting to the verity of the signatures and the sheet cannot be counted. Of greater concern to this Court is the fact this sheet has been notarized, despite the fact that the Darren Buzzard never signed the affidavit.[13]
2. Volume 3, petition 88. 14 additional signatures must be disallowed because Darren Buzzard did not affix his signature to this affidavit at all. The lack of a circulator’s signature means that no one is attesting to the verity of the signatures and the sheet cannot be counted. My previous concern is reiterated by the fact that this sheet has also been notarized, despite the fact that the Darren Buzzard never signed the affidavit.
3. Volume 5, petition 2. 11 additional signatures must be disallowed because Buzzard’s affidavit is incomplete.
4. Volume 5, petition 3. 13 signatures must be disallowed because Buzzard’s affidavit is incomplete.
In addition to these excluded signatures, a review of Darren Buzzard’s pamphlets reveals several signatures that have been signed by a single person on behalf of other people. A handwriting expert is not necessary. The forgery is painfully obvious to any reasonable person who looks at these petitions.
Some of these signatures appear as follows:
1. Volume 2, petition 16, lines 6 and 7 are identical.
2. Volume 6, petition 7, lines 14-15 are identical.
3. Volume 6, petition 29, lines 1-3 are identical (copied as part of this opinion at p. 19).
These petitions appear to be another instance of Darren Buzzard falsifying an affidavit by stating that each of the individuals personally signed in his presence. As such, all the signatures on these pamphlets must be excluded because the affidavits are falsified.[14] These indiscretions *50 require the exclusion of an additional 28 signatures.[15]
Courts in other jurisdictions have found that obvious falsity of signatures in petitions submitted by circulators justifies the disallowance of all signatures carried by that circulator without engaging in a signature by signature analysis. These courts, like the courts that would invalidate all the signatures of one circulator where it has been shown that the circulator falsified affidavits, find that at some point, the credibility of a circulator is irretrievably damaged.[16]
Unfortunately, Darren Buzzard and Dwayne Barrett are not the only circula-tors who turned in sheets with multiple names that are obviously written by a single person. Most of these violations tend to be people with the same last name and physical address. Two examples of this behavior are attached to this opinion at pages 20 and 21. A review of the petitions reveals many more instances of similar conduct but for purposes of this discussion, we need only highlight two examples. Volume 2 petition 22 and Volume 2 petition 44 contain an additional 28 signatures that should be rejected [17] because the circulators allowed individuals to sign the names of others. The exclusion of these signatures brings the total signatures that should have been excluded to 142, which is more than enough to invalidate the petition altogether without considering any other violations of law or irregularities.
The majority was willing to exclude an additional 13 signatures based on the testimony of Marilyn Vann. Ms. Vann testified that she purchased a copy of the voter’s list from the Election Commission. She noted that 13 signatures that were counted as registered voters were not on the registered voter’s list she obtained. In order to exclude these signatures I would re-verify the names with the Election Commission to make sure that all 13 are not registered voters. Because the majority refuses to reopen the record for this verification, I have no choice but to add signatures to the list I would exclude, bringing the total to 155.
Reinstated Signatures
The Election Commission appears to have excluded 18 voters because the names appeared more than once throughout the petition. I would re-verify with the Election Commission that those persons were excluded from the count altogether.
If this is the case, I would give the benefit of the doubt to our voters that these duplicate signatures were inadvertent mistakes and count one signature for each voter. This would reduce the disallowed signatures to 137, a number that *51 would require us to invalidate the initiative petition.
It should be noted that voters that were shown the required external warning page would have been on notice that it is a crime to sign the petitions twice. It begs the question of whether the required warning page was properly assembled and visible to the voters at the time the petitions were circulated.
Other Irregularities
1. Printed Names in Lieu of Signatures
Many voters were included in the count from pages where all the names were printed, rather than signed. In absence of any evidence to the contrary, I will presume that the voter intended to add their name to the petition. I will not disenfranchise any Cherokee voters where the irregularity appears to be a simple mistake. The legislature should, however, clarify what constitutes a legal “signature” for petition purposes.
2. Pamphlets Were Not Assembled and Circulated as Required by Law
LA 15-04 requires that petitions be circulated in pamphlet form. The original petition that was filed with the Election Commission was properly assembled as follows: (1) The external page contained the appropriate warning putting citizens on notice of possible violations of law associated with the petition;
(2) Page two contained the full language of the petition and ended with a brief statement of what was being proposed followed by 20 signature lines.
(3) Page three repeated the short statement and an additional 20 signature lines.
The legislation requires that a “true and correct” copy of the petition pamphlet be filed however, when the petitions were circulated, it is clear that they were not always in their full pamphlet form.
At the hearing, witnesses testified that they did not recall seeing the external warning page. A physical inspection of the petition pamphlets substantiates these claims. Throughout the pamphlets, many of the external warning pages appear in pristine condition, without any folds, creases, stains or other signs of weathering. Often times page two will have multiple stains, folds and other signs of heavy circulation while attached to a clean and unscathed external warning page. If these were circulated as a complete pamphlet in the field, it would stand to reason that all of the pages would share the same folds and indicate similar weathering from being reviewed and handled.
On other occasions, both the external page and page two, containing the actual language of the proposed amendment, will appear in pristine condition with the all twenty signatures lines blank. Page three will contain the only signatures in the pamphlet and page three will be weathered, containing folds that are not present in the other pages of the pamphlet. This suggests that page three was circulated individually and the packets assembled later.
The most glaring example is a pamphlet found in Volume 4, circulated by Darren Buzzard. Petitions number 9-17 were attached to a single external warning page. The pamphlet contains nine copies of page twTo and no copies of page three. The nine copies of page two are in varying condition, with the exception of page 12. Page 12 has been soaked through the front and back with a very large coffee stain that somehow escaped all the other pages in the bound pamphlet.
*52 The condition of these pamphlets, in isolation, might not raise concern. Given the other evidence in this case, the pamphlets suggest a pattern of disregard for the law by some of the circulators.
3. Voters Addresses (or P.O. Boxes) and Registration Numbers Required by Law
LA 15-04, § XV requires that each voter list their legal name and address and registration numbers. Signatures that lack an address must be excluded. Signatures that lack a registration number must be excluded. There are well over 100 signatures in the pamphlets that do not meet this requirement and must also be discounted.[18]
Remedies
Although not alone in his failure to abide by the law, it is clear that Darren Buzzard, the most prolific circulator in the process, disregarded the rules and falsified affidavits. In the interest of justice, this Court has three viable options: (1) Disallow all signatures carried by Darren Buzzard because he cannot be trusted; (2) Disallow no less than 137 signatures that are specifically referenced in this opinion;[19] or (3) Conduct a more thorough review to give the proponents a chance to rehabilitate the impeached circulators and give the challenger the opportunity to present the testimony of witnesses that were disallowed by this Court.
Options one and two would result in the invalidation of the petition and the cancellation of the February election. Option three would provide an adequate opportunity for both sides to address the problems raised in this petition. There are ten weeks before the special election and ample time to exercise this option. It is not reasonable to turn a blind eye and let the special election go forward under this cloud.
Due Process
I am concerned about one of the majority’s summary rulings in this case. During this expedited trial, the Court refused to allow the challenger to call certain witnesses. There was no pretrial conference or opportunity for the parties to challenge or defend a witness list. Instead, the challenger found out on the morning of the hearing that the Court would exclude certain witnesses.
The majority ruled that the challenger would not be permitted to proffer testimony to support her allegations of fraud and misrepresentations by the circulators of the petitions. The majority ruled that it is absolutely irrelevant what the circulators might have said to induce signatures. While I agree that we must presume Cherokee voters can read a petition and decide for themselves whether they want to sign the petition, this rule is not without limitation. Other jurisdictions have invalidated entire initiative petitions based on the fact that some circulators misrepresented the legal effect of initiative petitions.[20]
*53 I would certainly limit testimony to sole issue of whether the effect of the petition was misrepresented. I would honor the right of the Cherokee voters to voice their opinions about the initiative. I would always honor the right of the Cherokee voters to strongly advocate for their position. However, if there was testimony that the circulators misrepresented the ultimate effect of the petition as a means to induce more signatures, the Court should have allowed that testimony As it stands, we will never know what occurred because the majority refused to allow any testimony on this issue.[21]
Constitutionality of Special Election
I agree with the majority that the Principal Chief has the power to call a special election, provided that the initiative process otherwise complies with Cherokee law. Article XV, Section 1 states the people “reserve to themselves the power to propose laws and amendments to this Constitution and to enact or reject the same at the polls independent of the Council, and also reserve power at their own option to approve or reject at the polls any act of the Council.” If the people can call for an amendment independent of the Council, then the people don’t need a vote of the Council to place a proposed amendment on the ballot.
Article XV, Section 5 instructs that “all petitions and orders for the initiative and for the referendum shall be filed with the Secretary of State and addressed to the Principal Chief of the Cherokee Nation, who shall submit the same to the People.” It does not specify exactly how the Principal Chief is to present the question to the voters, be it in a general election or a special election.
The Constitution does allow the Council to call a special election for a constitutional amendment, by virtue of a two-thirds vote. Art. XV, § 2. The Constitution also allows a special election to be called for the purpose of voting on constitutional amendments proposed by a constitutional convention. Art. XV, § 9. There’s no reason to conclude that the power specifically reserved to the people is subordinate to the other means by Which a special election can be called to vote on constitutional amendments.[22]
Conclusion
The power to propose constitutional amendments is an awesome power. If we are going to amend our fundamental laws, we must ensure that the proper procedures are followed and that the integrity of the process is safeguarded.
This Court is the final gatekeeper of the integrity of the initiative process. In the interest of justice, this Court should have invalidated the initiative or, at the very least, conducted a more thorough review. To allow the initiative to move forward under this cloud of inequity is unconsciona *54 ble. The majority has sent a clear message to the Cherokee people that oar laws can be disregarded.
My decision does not preclude a future vote on this issue. The voters are already properly scheduled to vote on this constitutional amendment in the upcoming general election in June 2006?[23] In the future, it may very well come to pass that the Freedmen or other classes of Cherokee citizens are excluded by majority vote. If this occurs, let it happen only after full compliance with, and respect for, our own laws.
I respectfully dissent.
*55 [[Image here]]
*56 [[Image here]]
*57 [[Image here]]

. I agree with the majority that the wording of the petition, although not perfect, substantially complies with the LA 15-04. The average person reading the petition can ascertain that it proposes a constitutional amendment to limit membership/citizenship to persons who are listed on the Dawes Rolls as Cherokee by blood, Delaware and Shawnee and their descendants. I would not invalidate the petition on this challenge. At the time the *45 proponents began circulating the petitions, it was not clear whether we were operating under the 1975 or 1999 Constitution. I would not fault the voters for mentioning both constitutions, given that the membership/citizenship provisions are virtually the same in both constitutions.

. The Election Commission improperly interpreted the law and included signatures that have either an address or a registration number. The language states that each voter ‘'shall” write their name and address and registration number. LA 15-04, § XV.

. A few petition pamphlets were presented to the Election Commission on “short" sheets of paper. The original copy filed with the election commission was properly printed on legal size paper as required by law for uniformity. The Election Commission properly excluded these signatures because the petitions circulated were not true and correct copies of the petition pamphlet.

. Volume 5 petition 1 contained 20 signatures. The Election Commission previously rejected 1 signature.

. Volume I petition 7 contained 13 signatures. The Election Commission previously rejected 4 signatures.

. Volume 6 petition 6 contained 5 signatures. The Election Commission previously rejected 2 signatures.

. Several states have adopted this standard of shifting burdens. For example, in Ellis v. Hall, the Arkansas Supreme Court held that where fraud on the circulator's part is shown, the prima facie case in favor of genuineness of the petition is overcome, and the burden then shifts to the proponents to establish the genuineness of the petitions. The Oklahoma Supreme Court has also allowed the presumption of validity to be overcome by proof of fraud or procedural non-compliance. State Question No. 138, 114 Okla. 285, 244 P. 801, 803-04 Ü926). See also Montanans for Justice v. McGrath, 334 Mont. 237, 146 P.3d 759 (2006); Taxpayers Action Network v. Sec. of State, 795 A.2d 75, 80 (Me.2002); Weisberger *48 v. Cohen, 22 N.Y.S.2d 1011, 1012 (1940) (only sure way to prevent fraud is to invalidate all signatures tainted by fraud).

.The Illinois Supreme Court adopted this rule in Portas v. Dixon, 122 Ill.App.3d 697, 78 Ill.Dec. 496, 462 N.E.2d 615 (1984). The Arkansas Supreme Court adopted this rule in Sturdy v. Hall, 204 Ark. 785, 164 S.W.2d 884 (1942). In that the court emphasized that the circulator of an initiative petition is comparable to an election official and noted that the circulator is the only person in whose presence the citizen exercises their right to sign the petition. The circulator must make affidavit that each signature is genuine, and affidavits are shown to be false, the prima facie verity of his signatures are destroyed. Other jurisdictions have also adopted this approach.

. Parks v. Taylor, 283 Ark. 486, 678 S.W.2d 766 (1988). In Parks, the court excluded entirely all petitions of those affiants who falsified some of their affidavits even though the affiants merely said they did not actually see “all" the persons sign in their presence.

. Montanans for Justice v. McGrath, 334 Mont. 237, 146 P.3d 759 (2006); Citizens Committee for D.C, Lottery Terminal Initiative v. District of Columbia Board of Elections and Ethics, 860 A.2d 813 (D.C.2004).

. Oklahomans for Modern Alcoholic Beverage Controls, Inc., 501 P.2d 1089 (Okla.1972).

. This number constitutes the total signatures on each of these pages, less the signatures already excluded from the pages by the Election Commission.

. Oklahoma courts require the entire page to be thrown out if not properly verified on the back by an affidavit. In re Petition No. 365. State Question 687, 55 P.3d 1048 (Okla.2O02).

. In Huskey v. Municipal Officers of Electoral Board for the Village of Oak Lawn, 156 Ill.App.3d 201, 108 Ill.Dec. 859, 509 N.E.2d *50 555 (1987), the court invalidated the entire sheet for false affidavits, rather than eliminated only the forged signatures, where people signed for family members of other people.

.Volume 2 petition 16 contains 20 signatures. The Election Commission previously rejected 2 signatures. The remaining 18 signatures must be disallowed. Volume 6 petition 7 contains 20 signatures. The Election Commission previously rejected II signatures. The remaining 9 signatures must be disallowed. Volume 6 petition 29 contains 7 signatures. The Election Commission previously rejected 6 signatures. The remaining signature must be disallowed.

. See Williams v. District of Columbia Board of Elections, 804 A.2d 316 (D.C.2002).

. Volume 2 petition 22 contains II signatures. The Election Commission previously rejected 5 signatures. The remaining 6 must also be disallowed. Volume 1 petition 44 contains 17 signatures. The Election Commission previously rejected 5 signatures. The remaining 12 must also be disallowed.

. The Election Commission only discounted those that lacked both an address and a registration number.

. The actual number cannot be ascertained without adding in all the names that lack addresses and registration numbers which is no less than 100 signatures.

. In Citizens Committee for D.C. Lottery Terminal Initiative v. District of Columbia Board of Elections and Ethics, 860 A,2d 813 (D.C. 2004), all signatures gathered by a citizens’ group were stricken based on fraud some of the circulators falsified affidavits and made false statements to voters about the ultimate effect of the petition. In Operation King’s Dream v. Connerly, 2006 WL 2514115 (E.D.Mich.2006), a federal district court in Michigan found voter fraud existed where petition circulators told the voters they were *53 signing a petition supporting affirmative action, when if fact, the petition was to do away with affirmative action.

. Oklahoma courts have allowed this type of testimony to be presented, although they have not concluded that this type of evidence has required the invalidation of a petition. Initiative Petition No. 281, State Question No. 441, 434 P.2d 941 (Okla.1967).

. LA 15-04 does little to clarify this issue. Section IV of the Act mentions general elections only when providing a sample form for initiative petitions to follow. In contrast, Section VII mentions both regular and special election in reference to "any measure” that is either “initiated by the people” or "whenever the referendum shall be demanded against any measure passed by the Tribal Council.” The legislation is unclear whether an initiative petition can ever be set for a special election.

. The Council passed Resolution No. 63-06 placing this issue on the ballot for the next general election.