2012 ND 221

**Steven ZAISER, as Chairman of the Sponsoring Committee for the Statutory Initiative Relating to the North Dakota Medical Marijuana Act, Petitioner**

v.

**Alvin A. JAEGER, as Secretary of State of North Dakota, Respondent.**

**No. 20120346.**

Supreme Court of North Dakota.

Oct. 23, 2012.

Zachary E. Pelham and Christina A. Sambor, Bismarck, N.D., for petitioner; on brief.

Douglas A. Bahr, Solicitor General, Bismarck, N.D., for respondent; on brief.

KAPSNER, Justice.

[¶ 1]   Steven Zaiser, as Chairman of the Sponsoring Committee for the Statutory Initiative Relating to the North Dakota Medical Marijuana Act, asks this Court to order Secretary of State Alvin Jaeger to place an initiated measure for the Medical Marijuana Act on the November 6, 2012, general election ballot after the Secretary of State rejected 7,559 signatures on circulated petitions and decided the measure did not qualify for placement on that bal-

lot. The Sponsoring Committee claims that although the submitted petitions included some elector signatures forged by petition circulators, the petitions contained sufficient valid signatures to place the measure on the ballot. Because of time constraints for placing the measure on the November 6, 2012, ballot, we issued a dispositive order on September 19, 2012, denying the Sponsoring Committee's request for relief and stating a written opinion would be filed at a later date. *See Bolinske v. Jaeger*, 2008 ND 180, ¶ 1, 756 N.W.2d 336; *Municipal Servs. Corp. v. Kusler*, 490 N.W.2d 700, 701 (N.D.1992).

[¶ 2] The right to initiate and refer laws as a check on the legislative process is part of the fabric of our liberty, which is reserved to the people of North Dakota in the self-executing and mandatory provisions of N.D. Const. art. III. *Thompson v. Jaeger*, 2010 ND 174, ¶ 1, 788 N.W.2d 586. However, the people of North Dakota have also specified mandatory requirements for their exercise of the right to initiate laws, including a requirement that petition circulators "swear thereon that the electors who have signed the petition did so in their presence." N.D. Const. art. III, § 3. Because the circulators' petitions at issue in this case included signatures forged by the circulators in violation of that mandatory constitutional provision, the Secretary of State correctly rejected those petitions in calculating the number of elector signatures necessary to place the measure on the November 6, 2012, ballot and correctly determined the remaining petitions contained insufficient signatures to place the measure on that ballot. We issue this written opinion denying the Sponsoring Committee's request for relief.

I

[¶ 3] On May 22, 2012, the Sponsoring Committee submitted a petition for an ini-

tiated measure to enact the North Dakota Medical Marijuana Act to the Secretary of State for review and approval for circulation. The Secretary of State approved the petition for circulation on June 4, 2012. On August 6, 2012, the Secretary of State accepted delivery of 460 petitions for the initiated measure, which contained 20,092 signatures. The submitted petitions had attached circulators' affidavits required by N.D. Const. art. III, § 3, which followed the language of N.D.C.C. § 16.1–01–09(3) and said "that each signature contained on the attached petition was executed in my presence; and that to the best of my knowledge and belief each individual whose signature appears on the attached petition is a qualified elector; and that each signature contained on the attached petition is the genuine signature of the individual whose name it purports to be."

[¶ 4] The Secretary of State thereafter reviewed the petitions to determine their sufficiency and requested assistance from the Attorney General to investigate suspected forged signatures on the petitions. An August 17, 2012, report by an agent with the Bureau of Criminal Investigation stated:

During the North Dakota Secretary of State's review of the petitions, several concerns were raised regarding various petitions. Several of the petitions that had been circulated by various petition circulators contained qualified elector signatures that appeared to possibly have been forged. When looking at individual petitions, the North Dakota Secretary of State's office observed that several of the qualified elector signatures on the same petitions appeared to have different qualified elector names written in the same ink with the same penmanship.

[¶ 5] Bureau of Criminal Investigation reports reflect that on August 22, 2012, an

agent interviewed six petition circulators and all six circulators admitted they had forged signatures on petitions circulated by them. One circulator admitted that "every signature he turned in" was forged. Another circulator could not estimate the percentage of legitimate signatures he obtained, but thought he turned in "more legitimate signatures tha[n] forged signatures." Another circulator "had no idea the number of signatures he forged versus the number of legitimate signatures he obtained." Another circulator "estimated that about half (1/2) the signatures he turned in were legitimately obtained signatures." Another circulator stated "most of the signatures he turned in ... were forged." Another circulator stated "over half (1/2) of the signatures he turned in were forged signatures." The investigative reports state an agent met with the circulators and they "indicated that [they] would not be able to identify any legitimate signatures [they] obtained with a level of confidence that [they] would be willing to sign a petition circulator affidavit indicating the signatures were legitimately obtained."

[¶ 6] On September 4, 2012, the Secretary of State sent the Chairman of the Sponsoring Committee a letter, stating the Secretary of State had reviewed the sufficiency of the submitted petitions and notifying the Chairman the measure did not satisfy threshold signature requirements for placement on the November 6, 2012, general election ballot:

> As summarized on the next page, the review conducted by my office (and based on an investigation conducted by the Bureau of Criminal Investigation) revealed that I am unable to accept at least 7,559 signatures. When that number is subtracted from the 20,092 signatures that were submitted on the petitions, the remaining balance is 12,533 or

919 signatures fewer than the required threshold of 13,452.

The Secretary of State identified 6,045 signatures gathered by circulators who were "unwilling to re-affirm with their signature[s]" a circulator's affidavit in language following N.D.C.C. § 16.1–01–09(3). The Secretary of State also identified 1,514 additional signatures that could not be accepted for other reasons, including "bogus names, circulator from out-of-state, petition not circulated in its entirety, no address associated with signature, only a first name or a last name, no name, signature with out-of-state address, some person signed their own name and that of spouse/friend, no date appears on signature line beginning with first line, no date appears on signature line at the end, [and] date of signature was after the date the notarial act was executed." The Secretary of State indicated "[t]here was no random selection made of 2,000 names from the petitions for mailing postcards because the circulators had already indicated they would not re-affirm that all the signatures were genuine on the petitions they claimed to have circulated."

[¶ 7] On September 10, 2012, the Secretary of State "certif[ied to County Election Officials] the contests, candidates, and measures (including ballot language) that will appear on the ballot" for the November 6, 2012, general election. On September 14, 2012, the Chairman of the Sponsoring Committee asked this Court to "exercise its original jurisdiction and issue an order instructing the Secretary of State to place the initiated measure on the November 6, 2012, general election ballot and issue an immediate injunction preventing the Secretary of State from approving or printing any ballots until a ruling from this Court is made." After a responsive brief by the Secretary of State and a reply brief by the Chairman of the Sponsoring Committee and because of

**476**

time constraints for placing the initiative measure on the November 6, 2012, ballot, we issued a dispositive order on September 19, 2012, denying the requested relief and stating a written opinion would be filed at a later date. *See Bolinske,* 2008 ND 180, ¶ 1, 756 N.W.2d 336; *Municipal Servs. Corp.,* 490 N.W.2d at 701.

## II

■ [¶ 8] Under N.D. Const. art. III, "the people reserve the power to propose and enact laws by the initiative." N.D. Const. art. III, § 1. The provisions of N.D. Const. art. III, are self-executing and mandatory; however, the legislature may enact laws to facilitate and safeguard, but not to hamper, restrict, or impair the people's legislative powers. N.D. Const. art. III, § 1. The people's power to initiate legislation is a fundamental right, and we construe constitutional and statutory provisions liberally in favor of the people's exercise of their power. *Thompson,* 2010 ND 174, ¶ 11, 788 N.W.2d 586; *Husebye v. Jaeger,* 534 N.W.2d 811, 814 (N.D.1995); *Hernett v. Meier,* 173 N.W.2d 907, 911 (N.D.1970).

[¶ 9] After the Secretary of State approves an initiative petition for circulation under N.D. Const. art. III, § 2, the "petition shall be circulated only by electors" and the elector circulators "shall swear thereon that the electors who have signed the petition did so in their presence." N.D. Const. art. III, § 3. Under N.D. Const. art. III, § 3, "[e]ach elector signing a petition shall also write in the date of signing and his post-office address." "An initiative petition shall be submitted [to the Secretary of State] not less than ninety days before the statewide election at which the measure is to be voted upon." N.D. Const. art. III, § 5.

[¶ 10] Article III, § 6, N.D. Const., requires the Secretary of State to pass on the sufficiency of submitted petitions and provides:

The secretary of state shall pass upon each petition, and if he finds it insufficient, he shall notify the "committee for the petitioners" and allow twenty days for correction or amendment. All decisions of the secretary of state in regard to any such petition shall be subject to review by the supreme court. But if the sufficiency of such petition is being reviewed at the time the ballot is prepared, the secretary of state shall place the measure on the ballot and no subsequent decision shall invalidate such measure if it is at such election approved by a majority of the votes cast thereon. If proceedings are brought against any petition upon any ground, the burden of proof shall be upon the party attacking it.

Article III, § 7, N.D. Const., authorizes this Court to review all decisions by the Secretary of State in the petition process and provides:

All decisions of the secretary of state in the petition process are subject to review by the supreme court in the exercise of original jurisdiction. If his decision is being reviewed at the time the ballot is prepared, he shall place the measure on the ballot and no court action shall invalidate the measure if it is approved at the election by a majority of the votes cast thereon.

■ [¶ 11] Under those constitutional provisions, "the Secretary of State's responsibilities are limited to the form and the sufficiency of the petition." *State Bd. of Higher Educ. v. Jaeger,* 2012 ND 64, ¶ 10, 815 N.W.2d 215. We have original jurisdiction to review decisions by the Secretary of State regarding the sufficiency of petitions for initiated measures under the mandatory self-executing provisions of N.D. Const. art. III, §§ 6 and 7. *See*

*Thompson,* 2010 ND 174, ¶ 5, 788 N.W.2d 586; *Husebye,* 534 N.W.2d at 813; *Municipal Servs. Corp.,* 490 N.W.2d at 701–02.

[¶ 12] The legislature also has enacted statutory provisions for the initiative process, which must be construed to facilitate and safeguard, but not to hamper, restrict, or impair the process. *See* N.D. Const. art. III, § 1. Only qualified electors may sign initiative petitions, and "[e]very qualified elector signing a petition shall do so in the presence of the individual circulating the petition." N.D.C.C. § 16.1–01–09(2). *See also* N.D. Const. art. III, § 3 (circulators "shall swear thereon that the electors who have signed the petition did so in their presence"). Section 16.1–01–09(3), N.D.C.C., describes the form for circulators' affidavits that must be attached to each copy of a petition submitted to the Secretary of State in language requiring the circulator to subscribe and swear before a notary public "that each signature contained on the attached petition was executed in my presence; and that to the best of my knowledge and belief each individual whose signature appears on the attached petition is a qualified elector; and that each signature contained on the attached petition is the genuine signature of the individual whose name it purports to be." Section 16.1–01–10, N.D.C.C., provides guidelines for the Secretary of State's review of the sufficiency of petitions:

The secretary of state shall have a reasonable period, not to exceed thirty-five days, in which to pass upon the sufficiency of any petition mentioned in section 16.1–01–09. The secretary of state shall conduct a representative random sampling of the signatures contained in the petitions by the use of questionnaires, postcards, telephone calls, personal interviews, or other accepted information-gathering techniques, or any combinations thereof, to determine the validity of the signatures. Signatures determined by the secretary of state to be invalid may not be counted and all violations of law discovered by the secretary of state must be reported to the attorney general for prosecution.

A

[¶ 13] The Secretary of State argues the Sponsoring Committee's application to this Court for review is not timely because it was filed on September 14, 2012, after his September 10, 2012, certification of the ballot to county election officials. The Secretary of State argues state law requires him to certify the ballot no less than fifty-five days before the election under N.D.C.C. §§ 16.1–01–07 and 16.1–12–04, which he did on September 10, 2012, and federal and state law under 42 U.S.C. § 1973ff–1 and N.D.C.C. § 16.1–07–23 require ballots to be ready for distribution to military and overseas voters by the forty-sixth day before the election, which was September 21, 2012. The Secretary of State essentially argues the ballot was completed and prepared when he certified it to county election officials on September 10, 2012, or when he was statutorily required to certify it on September 12, 2012.

[¶ 14] The Sponsoring Committee responds the Secretary of State has not attempted to obtain a hardship waiver under N.D.C.C. § 16.1–07–23 and 42 U.S.C. § 1973ff–1(g)(2)(B) for ballots for military and overseas voters. The Sponsoring Committee thus argues that although the Secretary of State may have "certified" the ballot to county election officials on September 10, 2012, the ballot had not been "prepared" on that date under the language of N.D. Const. art. III, §§ 6 and 7.

[¶ 15] "An initiative petition may be circulated for one year from the date it is approved for circulation by the secretary of state." N.D.C.C. § 16.1–01–09(7).

However, N.D. Const. art. III, § 5 requires that "[a]n initiative petition shall be submitted [to the secretary of state] not less than ninety days before the statewide election at which the measure is to be voted upon." Under N.D.C.C. § 16.1–01–10, the Secretary of State "shall have a reasonable period, not to exceed thirty-five days, in which to pass upon the sufficiency" of an initiative petition. If the Secretary of State determines a submitted petition is insufficient, the Secretary of State "shall notify the 'committee for the petitioners' and allow twenty days for correction or amendment." N.D. Const. art. III, § 6. State law requires the Secretary of State to "certify" ballot forms to each county auditor not less than fifty-five days before the election. N.D.C.C. §§ 16.1–01–07 and 16.1–12–04. For all elections for which North Dakota has not received a hardship exemption waiver under 42 U.S.C. § 1973ff–1(g)(2), the appropriate election official shall transmit ballots and balloting materials to covered voters who have validly applied for military or overseas ballots no later than forty-five days before the election. N.D.C.C. § 16.1–07–23. If the Secretary of State's decision on the sufficiency of a petition is being reviewed by this Court "at the time the ballot is prepared," the measure shall be placed on the ballot. N.D. Const. art. III, §§ 6 and 7. See Shore v. Meier, 122 N.W.2d 566, 568–69 (N.D.1963).

[¶ 16] These constitutional and statutory time frames for the initiative process involve some incongruities, which, for purposes of this Court's review of the Secretary of State's decision, ultimately requires an assessment of when a ballot is "prepared" under N.D. Const. art. III, §§ 6 and 7. We need not resolve issues about when the ballot was "prepared" in this case, however, because we assume, without deciding, the ballot was not prepared under N.D. Const. art. III, §§ 6 and 7 when

the Sponsoring Committee petitioned this Court to review the Secretary of State's decision that the measure did not qualify for placement on the November 6, 2012, ballot. We therefore consider the merits of the Sponsoring Committee's arguments.

B

[¶ 17] The Sponsoring Committee argues the Secretary of State cannot constitutionally and statutorily refuse to count all the signatures in the disputed petitions because evidence exists that some of the signatures in those petitions are valid. The Sponsoring Committee argues the Secretary of State has a constitutional and statutory duty to decide the sufficiency of the signatures and he should have conducted a signature-by-signature review to ascertain which signatures in the disputed petitions were valid. The Sponsoring Committee claims the Secretary of State has the burden of establishing which signatures in the disputed petitions are invalid, and he provided no evidence that all the signatures in those petitions were invalid.

[¶ 18] The Secretary of State responds he has some deferential discretion in deciding the sufficiency of petitions with admitted forgeries by petition circulators and he properly rejected the disputed petitions in this case because they do not conform to constitutional and statutory requirements. He claims he was entitled to refuse to count signatures in petitions in which the petition circulators admittedly signed false affidavits averring each elector's signature was executed in the circulators' presence and each signature on the petition was a genuine signature of the individual whose name it purported to be.

[¶ 19] We initially reject the Sponsoring Committee's claim the Secretary of State has the burden of establishing which signatures on the disputed peti-

tions are invalid under N.D. Const. art. III, § 6, which says that "[i]f proceedings are brought against any petition upon any ground, the burden of proof shall be upon the party attacking it." The Secretary of State has not brought a proceeding against the initiative petition. *See McCarney v. Meier,* 286 N.W.2d 780, 783 (N.D.1979) (explaining Secretary of State's determination in reviewing sufficiency of petitions was not proceeding against petition and there was no burden of proof upon any parties in that case because principal question was entirely one of law). Rather, the Sponsoring Committee has brought an action challenging the Secretary of State's decision. The Secretary of State has a constitutional and statutory duty to pass on the sufficiency of petitions. N.D. Const. art. III, § 6; N.D.C.C. § 16.1–01–10. This Court has recognized the Secretary of State has some discretion in passing on the sufficiency of submitted petitions. *Hernett,* 173 N.W.2d at 918. To the extent the Secretary of State's decision involves the exercise of some discretion, his decision is entitled to some deference; however, to the extent his decision involves a question of law, the review is de novo, and neither party has the burden of proof.

[¶ 20] Under N.D.C.C. § 16.1–01–10, the Secretary of State shall have a reasonable period, not to exceed thirty-five days, in which to pass on the sufficiency of any petition and the Secretary of State "shall conduct a representative random sampling of the signatures contained in the petitions by the use of questionnaires, postcards, telephone calls, personal interviews, or other accepted information-gathering techniques, or any combinations thereof, to determine the validity of the signatures." The language of N.D.C.C. § 16.1–01–10 requires the Secretary of State to conduct a representative random sampling of signatures in the petitions, but provides the Secretary of State with options for the method of the sampling, including personal interviews, other accepted information-gathering techniques, or any combinations of the described methods. The plain language of N.D.C.C. § 16.1–01–10 gives the Secretary of State some discretion for the method of conducting a representative random sampling in reviewing the sufficiency of petitions. *See* N.D.C.C. § 1–02–02 (words in a statute understood in ordinary sense). Contrary to the Sponsoring Committee's claim, the plain language of N.D.C.C. § 16.1–01–10 does not require the Secretary of State to mail 2,000 random questionnaires or postcards to signers of the submitted petitions.

[¶ 21] Here, when the Secretary of State notified the Chairman of the Sponsoring Committee the submitted petitions were insufficient to place the measure on the ballot, the record reflects the Secretary of State, through the Bureau of Criminal Investigation, had conducted personal interviews of six petition circulators. In that manner the Secretary of State determined that some signatures on those circulators' petitions were forged by the circulators and that those circulators' affidavits falsely averred each signature in their petitions was executed in the circulators' presence and was the genuine signature of the individual whose name it purported to be. We have said that in passing on the sufficiency of a petition, there is a presumption that each signature in the petition is the genuine signature of the person whose name it purports to be. *Hernett,* 173 N.W.2d at 908, Syll. 2. In *Hernett,* at 911, however, there was no claim the signatures were not genuine signatures of the persons whose names they purported to be. Here, the Secretary of State's review of the petitions revealed signatures that were admittedly forged by the circulators and were not signatures of the person whose name it purported to be. Any pre-

sumption of validity has been overcome by the Secretary of State's review and the circulators' admissions of forged signatures. Based on the Secretary of State's review, the circulators' false affidavits at issue in this case violated both the substantive constitutional requirement of N.D. Const. art. III, § 3, that the circulators "shall swear thereon that the electors who have signed the petition did so in their presence" and the similar statutory requirements of N.D.C.C. § 16.1–01–09(3).

[¶ 22] This Court has said that if the "jurat on one copy of the petition containing 6 signatures bears no signature of the affiant and four other copies containing 96 signatures do not purport to have been sworn to," those signatures may not be counted. *Dawson v. Meier*, 78 N.W.2d 420, 426 (N.D.1956). This Court explained "[s]ignatures on copies of a petition may not be counted where the attached affidavit is not signed by an affiant or where the jurat does not bear the signature of an official authorized to administer an oath." *Id.* at 422, Syll. 10. When this Court decided *Dawson*, circulators' affidavits were required by statute and were not constitutionally required. *See Dawson*, at 423–24; N.D. Const. art. II, § 25 (1919); N.D.R.C. § 16–0111 (1943). This Court's statements in *Dawson* involved an attached affidavit not signed by an affiant. The parties have not cited, and we have not found any North Dakota precedent specifically addressing the effect of a circulator forging elector signatures on initiative petitions and submitting false circulator affidavits. However, this Court's decision in *Dawson* holds that elector signatures on petitions may not be counted if the attached affidavit has no signature and supports the Secretary of State's decision that elector signatures on petitions with false circulator affidavits may not be counted.

[¶ 23] Other courts have held that petition circulators' false affidavits invalidate all the signatures in that petition. *Brousseau v. Fitzgerald*, 138 Ariz. 453, 675 P.2d 713, 715–16 (1984); *Sturdy v. Hall*, 201 Ark. 38, 143 S.W.2d 547, 550–52 (1940); *Citizens Comm. v. District of Columbia Bd. of Elections and Ethics*, 860 A.2d 813, 816–17 (D.C.2004); *Montanans for Justice v. State ex rel. McGrath*, 2006 MT 277, ¶¶ 83–84, 334 Mont. 237, 146 P.3d 759; *Taxpayers Action Network v. Secretary of State*, 2002 ME 64, ¶¶ 18–19, 795 A.2d 75; *McCaskey v. Kirchoff*, 56 N.J.Super. 178, 152 A.2d 140, 142–43 (N.J.Super.Ct.App.Div.1959); *In re Glazier*, 474 Pa. 251, 378 A.2d 314, 315–16 (1977); *State ex rel. Gongwer v. Graves*, 90 Ohio St. 311, 107 N.E. 1018, 1022 (1913).

[¶ 24] In *Brousseau*, 675 P.2d at 715–16, the Arizona Supreme Court explained the rationale for invalidating all signatures on petitions with false circulator affidavits:

Defects either in circulation or signatures deal with matters of form and procedure, but the filing of a false affidavit by a circulator is a much more serious matter involving more than a technicality. The legislature has sought to protect the process by providing for some safeguards in the way nomination signatures are obtained and verified. Fraud in the certification destroys the safeguards unless there are strong sanctions for such conduct such as voiding of petitions with false certifications.

. . . .

The authorities agree that statutory circulation procedures are designed to reduce the number of erroneous signatures, guard against misrepresentations, and confirm that signatures were obtained according to law. To allow the integrity of the nominating petition process to be violated ... through ... certification of the petitions by persons oth-

er than the actual circulators without any sanction other than the inconvenience of showing that the signatures were in fact authentic would render the circulation requirement meaningless and possibly lead to additional falsehood and fraud by others. We believe that there is a real difference between mere omissions or irregularities and fraud.... We hold that petitions containing false certifications by circulators are void, and the signatures on such petitions may not be considered in determining the sufficiency of the number of signatures to qualify for placement on the ballot.

[¶ 25] In *Graves*, 107 N.E. at 1022, the Ohio Supreme Court also discussed the effect of false circulators' affidavits on valid signatures in a petition:

It is insisted, however, that all the names upon any part of a petition should not be rejected because one or more is forged, false, or fraudulent, and that is true if the verification to that part is not a perjury. These petitions and each separate part thereof depend for their efficiency and their validity upon the affidavit of the circulator that each of the signatures attached to such part was made in the presence of affiant; that to the best of his knowledge and belief it is the signature of the person it purports to be; that he believes the person who signed it to be an elector.... If it appears from the evidence that the affidavit so attached to any petition or part of a petition is knowingly and intentionally false, then the affidavit is a perjury and can serve no purpose whatever; the whole part of the petition dependent thereon for its validity must fall. The Constitution requires an affidavit to each part of a petition, and without that affidavit it would be as worthless as blank paper, no matter if every signature thereon were genuine. An affidavit

proven to be willfully, corruptly, and intentionally false is worse than no affidavit at all, for it brands the whole part of the petition to which it is attached with the indicia of fraud. If no affidavit is fatal to the whole petition or any separate part thereof, although the lack of such affidavit is due to innocent mistake, oversight or inadvertence, of the person circulating the same, and if all the signatures appearing thereon must be rejected without reference to whether they are genuine or not, upon what rule can it be said that it is the duty of the secretary of state, where it appears that the affidavit to any part of a petition is willfully, corruptly, and intentionally false, to determine upon other evidence the genuineness of signatures appearing thereon and, if he finds that there are some genuine signatures upon that particular part, to include them in the count? Such a holding would be an invitation to commit fraud and perjury.

It is not sufficient that some of the signatures on some of the parts of a petition are genuine, nor is it absolutely necessary to the validity of the petition or any part thereof that every signature thereon should be genuine; but it is absolutely necessary to the validity of the petition or any part thereof that the circulator, when he makes affidavit certifying the signatures on these petitions, should believe that he is stating the truth. If it later appear that some one has imposed upon him and signed or forged the name of another, the circulator may still believe in the truth of his affidavit and it will support every genuine signature upon it, and only the ones not genuine will be stricken therefrom. But if the circulator knew that a signature appearing on such part of a petition is not genuine, if he knew that such signature was not written on the petition in his presence, if he knew that the

person whose signature it purports to be was not an elector, if he knew that the person signing said petition did not sign it with knowledge of its contents, yet, notwithstanding his knowledge, he willfully, corruptly, and intentionally makes a false and perjured affidavit to the contrary, then such affidavit is worthless, and the petition or part of a petition to which it is attached does not fill the requirement of the Constitution, and the genuine signatures thereon cannot be counted for the reason that part of the petition lacks the affidavit required by the Constitution.

[¶ 26] We agree with the rationale of those cases describing the essential nature of a circulator's affidavit under our constitutional requirement for the contents of a circulator affidavit and the statutory framework for that affidavit. The legislature has explicitly recognized the seriousness of forged signatures in the initiative process and made it unlawful for a person to "[s]ign a name other than that person's own name to an initiative … petition." N.D.C.C. § 16.1–01–12(9). Under those decisions and our constitutional and statutory provisions, the validity of submitted petitions depends upon the veracity of the circulators' averment that each of the signatures in the petition was made in the circulators' presence and each signature was the genuine signature of the individual whose name it purports to be. The rationale of those decisions is consistent with this Court's statement in *Dawson* that "[s]ignatures on copies of a petition may not be counted where the attached affidavit is not signed by an affiant." *Dawson*, 78 N.W.2d at 422, Syll. 10. We conclude the Secretary of State may not count elector signatures on petitions with circulator's affidavits that do not comply with the requirements of N.D. Const. art. III, § 3, and N.D.C.C. § 16.1–01–09(3).

[¶ 27] Under N.D. Const. art. III, § 6, if the Secretary of State decides a petition for an initiative measure is insufficient, he shall allow twenty days for correction or amendment. In *Hernett*, 173 N.W.2d at 914, this Court discussed the language allowing correction or amendment of a petition in the context of amended circulators' affidavits. There, the signing date given by electors in some petitions was after the date of the circulators' affidavits. *Id.* This Court said when the Secretary of State became aware of the discrepancies in the dates, it became the Secretary of State's duty to refuse to count those signatures, but the Secretary of State was required to notify the committee for the petitioners to allow twenty days for correction or amendment of those petitions. *Id.* In *Hernett*, corrected affidavits of circulators were submitted and the signatures, after correction of the affidavits, were properly counted by the Secretary of State as valid signatures. *Id.*

[¶ 28] Here, the five petition circulators with some valid signatures on their circulated petitions "indicated that [they] would not be able to identify any legitimate signatures [they] obtained with a level of confidence that [they] would be willing to sign a petition circulator affidavit indicating the signatures were legitimately obtained." These circulators did not correct or amend their affidavits to identify legitimate signatures, and under these circumstances and assuming, without deciding, those circulators may have been entitled to amend or correct their affidavits to cure that deficiency, we conclude the Secretary of State did not err in not counting signatures on the circulators' petitions at issue in this case. *See* N.D. Op. Atty. Gen. 95–L–201, p. 4 (quoting *Dixon v. Hall*, 210 Ark. 891, 198 S.W.2d 1002, 1003 (1946) (stating "[c]orrection and amendment go to form and error, rather than to complete failure")). The Sponsoring Committee has

not argued about or identified any possible corrections or amendments to the disputed petitions that could have been made during that period.

[¶ 29] On this record, we conclude the Secretary of State correctly determined the petitions with elector signatures forged by circulators and accompanied by false circulators' affidavits could not be used to calculate the number of elector signatures necessary to place the initiative measure on the November 6, 2012, general election ballot and the remaining petitions were insufficient to place the measure on that ballot.

### C

[¶ 30] The Sponsoring Committee argues the Secretary of State should be estopped from not counting any of the 6,045 signatures in the disputed petitions based on the circulators' refusal to reaffirm an affidavit they had already signed. The Sponsoring Committee claims the Secretary of State failed to conduct a representative sampling of signatures in the petitions as required by N.D.C.C. § 16.1–01–10. The Sponsoring Committee further claims the Secretary of State failed to select 2,000 random names from the petitions for mailing postcards.

[¶ 31] Section 16.1–01–10, N.D.C.C., gives the Secretary of State some discretion in the method for passing on the sufficiency of a petition, including authorizing the Secretary of State to rely on "personal interviews, or other accepted information-gathering techniques, or any combinations thereof" as methods of determining the sufficiency of a petition. We have held the plain language of N.D.C.C. § 16.1–01–10, does not require mailing questionnaires or postcards to 2,000 random signatories on the petitions, and we reject the Sponsoring Committee's argument the Secretary of State is estopped from not placing the measure on the ballot.

### III

[¶ 32] We deny the Sponsoring Committee's request to place the initiative measure on the November 6, 2012, general election ballot.

[¶ 33] GERALD W. VANDE WALLE, C.J., DALE V. SANDSTROM, DANIEL J. CROTHERS, and MARY MUEHLEN MARING, JJ., concur.