# IN THE SUPREME COURT
## STATE OF NORTH DAKOTA

### 2022 ND 168

Jared Hendrix, as chairman of the
North Dakota for Term Limits
Sponsoring Committee, and North
Dakota for Term Limits,                                          Petitioners

v.

Alvin A. Jaeger, in his official capacity
as North Dakota Secretary of State,                            Respondent

### No. 20220233

Petition for Writ of Mandamus.

PETITION GRANTED.

Opinion of the Court by Tufte, Justice.

Edward D. Greim (argued) and Matthew R. Mueller (on brief), Kansas City,
Missouri, and Jesse H. Walstad (appeared), Bismarck, North Dakota, for
petitioners.

David R. Phillips, Special Assistant Attorney General (argued), Matthew A.
Sagsveen, Solicitor General (appeared), and the Honorable Drew H. Wrigley,
Attorney General (appeared), Bismarck, North Dakota, for respondent.

**Hendrix v. Jaeger**
No. 20220233

**Tufte, Justice.**

[¶1]   Jared Hendrix, as chairman of the North Dakota for Term Limits Sponsoring Committee, and North Dakota for Term Limits (collectively, "Petitioners" or "Committee") petition for a writ of mandamus requiring the Secretary of State to place the Term Limits Initiative on the November 8, 2022, general election ballot. The Secretary of State rejected 29,101 signatures on circulated petitions and concluded the initiative did not qualify for placement on the ballot. The Petitioners argue the Secretary of State improperly invalidated signatures on the basis of a finding of notary fraud relating to two circulators, a pattern of notary fraud relating to one notary, violation of the pay-per-signature ban, and other issues. We conclude the Secretary of State misapplied the law by excluding signatures on the basis of a determination that a pattern of likely notary violations on some petitions permitted his invalidation of all signatures on all petitions that were sworn before the same notary. Because adding the signatures invalidated for imputed fraud to the 17,265 other signatures accepted by the Secretary of State places the initiative over the constitutional requirement of 31,164, we grant the Committee's petition and issue a writ of mandamus requiring the Secretary of State to place the Term Limits Initiative on the November 8, 2022, ballot.

I

[¶2]   In July 2021, the Committee submitted the Term Limits Initiative petition to the Secretary of State for review and approval. The proposed initiative would create a new article in the North Dakota Constitution imposing term limits on the Governor and members of the Legislative Assembly. The Secretary of State approved the petition for circulation. To place the initiative on the November 2022 ballot, the Committee was required to gather 31,164 qualified elector signatures.

[¶3]   On February 15, 2022, the Secretary of State received 1,441 petition packets containing 46,366 elector signatures from the Committee. On March 22, 2022, the Secretary of State notified the Committee that 29,101 signatures

were invalid and thus it had failed to submit enough valid signatures to place the initiative on the November ballot. He informed the Committee that he would not certify the initiative for placement on the ballot. The Committee requested an opportunity to review the petitions and the specific reasons for the rejection of each signature. In the following weeks, the Secretary of State returned the petitions, provided a spreadsheet outlining his reasons for rejecting signatures, and advised the Committee it had 20 days to review the rejections and provide any corrections.

[¶4]   The Secretary of State invalidated every elector signature appearing on petitions gathered by circulators whose affidavits were notarized by Zeph Toe. The Secretary of State informed the Committee that "[s]everal signatures of circulators were likely forged on affidavits in the presence of [Toe]. Therefore, all affidavits (attached to 751 petitions that included 15,740 signatures) notarized by [Toe] were not counted." In reaching this decision, two petition circulators raised "red flags" for the Secretary of State: Chloe Lloyd and Ramona Morris. The Secretary of State determined their signatures on circulator affidavits attached to the petitions were inconsistent. As a result of his opinion that these signatures "vary wildly," the Secretary of State inferred they had not been signed in the presence of Toe when he notarized them, which would be unlawful and raise serious credibility concerns about Toe.

[¶5]   In August 2022, the Committee petitioned the Court for a writ of mandamus requiring the Secretary of State to place the Term Limits Initiative on the November 8, 2022, general election ballot. We ordered the district court to hold an evidentiary hearing and make findings of fact on the Secretary of State's disqualification of petition signatures. On August 23, 2022, the court held the evidentiary hearing.

II

[¶6]   The people of North Dakota reserved to themselves the power to propose and adopt constitutional amendments by the initiative. N.D. Const. art. III, § 1. "Laws may be enacted to facilitate and safeguard, but not to hamper, restrict, or impair these powers." *Id.* "All decisions of the secretary of state in the petition process are subject to review by the supreme court in the exercise

2

of original jurisdiction." N.D. Const. art. III, § 7; *see also* N.D. Const. art. III, § 6 (stating all decisions of the Secretary of State "in regard to any petition are subject to review by the supreme court"). We have mandatory original jurisdiction under N.D. Const. art. III, §§ 6, 7. *Zaiser v. Jaeger*, 2012 ND 221, ¶ 11, 822 N.W.2d 472; *N.D. State Bd. of Higher Educ. v. Jaeger*, 2012 ND 64, ¶¶ 10, 13, 815 N.W.2d 215.

[¶7]   The Secretary of State has a constitutional duty to pass upon the sufficiency of initiative petitions. N.D. Const. art. III, § 6. According to N.D.C.C. § 16.1-01-10, this duty must be completed within thirty-five days. We have recognized the Secretary of State "has some discretion in passing on the sufficiency of submitted petitions." *Zaiser*, 2012 ND 221, ¶ 19. However, these responsibilities are "limited" and "ministerial in nature." *Haugen v. Jaeger*, 2020 ND 177, ¶ 4, 948 N.W.2d 1 (quoting *Bd. of Higher Educ.*, 2012 ND 64, ¶ 10). If the Secretary of State's decision "involves the exercise of some discretion, his decision is entitled to some deference; however, to the extent his decision involves a question of law, the review is de novo, and neither party has the burden of proof." *Zaiser*, at ¶ 19.

## A

[¶8]   The Petitioners argue the Secretary of State erred by invalidating 15,740 otherwise valid signatures merely because they appeared on petitions gathered by circulators whose affidavits were notarized by Zeph Toe. The March 22, 2022, letter from the Secretary of State to the Committee stated, "Several signatures of circulators were likely forged on affidavits in the presence of a notary public. Therefore, all affidavits (attached to 751 petitions that included 15,740 signatures) notarized by this notary were not counted." The 751 petitions having a circulator affidavit notarized by Zeph Toe contained 21,684 signatures, 5,944 of which were deficient for other reasons and 15,740 of which were otherwise "valid" and disqualified solely on the basis of the Zeph Toe notarization.

[¶9]   At all relevant times, Toe has been a North Dakota notary in good standing. On April 11, 2022, during the 20-day correction period, the Committee provided the Secretary of State an affidavit from Toe attaching

some of his notary logbook entries. Toe attested he followed the law in identifying the circulators appearing before him and witnessed the circulators sign the petitions before he notarized them. Lloyd, the circulator whose signatures raised suspicion, also provided an affidavit, dated April 14, 2022, stating the disputed signatures were her signatures. The Secretary of State did not consider either affidavit for purposes of correction, explaining Zeph Toe's affidavit "was inaccurate because the signatures varied too much among the various petitions; so I can't believe it." The district court disregarded these affidavits as untimely and untruthful. In original jurisdiction cases such as this, we do not apply the clearly erroneous standard, but rather give the district court's findings of fact "appreciable weight." *Berg v. Jaeger*, 2020 ND 178, ¶¶ 14-15, 948 N.W.2d 4.

[¶10] The Secretary of State had no more than 35 days to pass upon the sufficiency of the initiative petition under N.D.C.C. § 16.1-01-10, which in this case was March 22, 2022. After the Secretary of State's 35-day review period closes, Article III, § 6, of the North Dakota Constitution allows twenty days to correct an insufficient petition from the date the Secretary of State notifies the sponsoring committee. Although the Committee was initially notified of the insufficient petition on March 22, 2022, the Committee did not receive the spreadsheet outlining the precise reasons for excluding each signature until April 5, or the last of the returned petitions until April 11. The Secretary of State does not contest the timeliness of these affidavits, and we conclude both were timely submitted to the Secretary of State. The Secretary of State explained he viewed the affidavits as untruthful on the basis of his belief that the signatures on the circulator affidavits varied too much to be anything other than fraudulent. As a result, he determined that both Lloyd and Toe lacked credibility to submit an affidavit that should be considered. We consider all information available to the Secretary of State when the final decision was made at the end of the correction period.

B

[¶11] We begin our analysis by stating what we do not decide here. The Secretary of State determined that differences in handwriting by petition circulators Chloe Lloyd and Ramona Morris in their affidavits purportedly

4

sworn before notary Zeph Toe were sufficient on their own (despite supplemental affidavits disputing the alleged fraud) to find the notarial act by Toe was fraudulent. We need not review whether that finding was supported by the information available to the Secretary of State at the time he determined the petition was insufficient. Assuming without deciding that the petitions having circulator affidavits by either Lloyd or Morris and sworn before Toe were properly excluded for fraud, we conclude the dispositive issue is whether there is legal authority supporting the Secretary of State's decision to impute that fraud to all petitions having circulator affidavits sworn to before the same notary.

[¶12] Concerning only the petition affidavits notarized by Toe, the record reflects a total of 1,043 "valid" signatures on the Lloyd petitions and zero "valid" signatures on the Morris petitions.[1] The disqualification of petitions

---

[1] Chloe Lloyd submitted the following petition packets having a circulator's affidavit notarized by Toe.

| Pet. No. | Invalid | Valid | Raw Total |
|---|---|---|---|
| 808 | 49 | 0 | 49 |
| 809 | 11 | 37 | 48 |
| 812 | 7 | 39 | 46 |
| 814 | 15 | 35 | 50 |
| 815 | 5 | 45 | 50 |
| 816 | 8 | 42 | 50 |
| 817 | 20 | 30 | 50 |
| 818 | 10 | 40 | 50 |
| 819 | 9 | 41 | 50 |
| 820 | 8 | 42 | 50 |
| 821 | 15 | 35 | 50 |
| 824 | 5 | 12 | 17 |
| 825 | 13 | 37 | 50 |
| 826 | 11 | 39 | 50 |
| 827 | 5 | 45 | 50 |
| 828 | 9 | 41 | 50 |
| 829 | 15 | 35 | 50 |
| 830 | 11 | 39 | 50 |
| 831 | 15 | 34 | 49 |
| 832 | 15 | 35 | 50 |
| 833 | 33 | 17 | 50 |
| 1377 | 7 | 33 | 40 |
| 1378 | 3 | 37 | 40 |
| 1379 | 6 | 34 | 40 |
| 1382 | 1 | 5 | 6 |
| 1385 | 2 | 12 | 14 |

having circulator affidavits notarized by Toe invalidated 15,740 signatures solely on the basis of the Toe notarization. Those 15,740 signatures included all Morris and Lloyd signatures indicated as valid in the Secretary of State's summary. The Secretary of State's inference of fraud due to inconsistent signatures attached to these Lloyd and Morris petition packets directly implicates 1,043 otherwise valid signatures. The Secretary's imputation of fraud to the remaining petition packets notarized by Toe, but not circulated by Lloyd or Morris, accounts for invalidation of the other 14,697 signatures (15,740 minus 1,043). If, as petitioners argue, imputed fraud may not be a basis for invalidating signatures, that question alone is dispositive and we need not review whether there is sufficient support for the Secretary of State's finding of fraud.

[¶13] Without conceding the circulator signatures taken before Toe were inconsistent, the Petitioners contend that even if some circulator affidavits had inconsistencies or some circulator signatures were actually forged, the invalidation of all elector signatures on all petition packets notarized by Toe is unprecedented and unlawful. The Petitioners cite several cases from other jurisdictions in support of rejecting only those signatures that are actually and demonstrably fraudulent, not the otherwise valid elector signatures. *See Bradshaw v. Ashcroft*, 559 S.W.3d 79, 88 (Mo. Ct. App. 2018) (concluding statute did not "expressly provide that a circulator's dishonesty in an affidavit, or a notary's dishonesty in an attestation, will require otherwise valid voter signatures not to be counted"); *Committee for a Healthy Future, Inc. v.*

---

| | | | |
|---|---|---|---|
| 1391 | 10 | 22 | 32 |
| 1392 | 5 | 30 | 35 |
| 1394 | 2 | 35 | 37 |
| 1397 | 5 | 12 | 17 |
| 1398 | 1 | 17 | 18 |
| 1401 | 6 | 15 | 21 |
| 1404 | 3 | 23 | 26 |
| 1405 | 3 | 23 | 26 |
| 1406 | 2 | 25 | 27 |
| | 345 | 1043 | 1388 |

Ramona Morris submitted six petition packets numbered 1111, 1112, 1113, 1114, 1115, and 1116 having a circulator's affidavit notarized by Toe. The Secretary of State's Apr. 5, 2022 summary of the petition packets indicates there were no valid signatures in these petition packets.

6

*Carnahan*, 201 S.W.3d 503, 509 (Mo. 2006) (en banc) (stating that "[i]f the validity of the voters' signatures can be otherwise verified, their signatures should not be invalidated by the notary's negligence or deliberate misconduct"); *United Labor Committee of Missouri v. Kirkpatrick*, 572 S.W.2d 449, 454 (Mo. 1978) (en banc) (same); *Hebert v. State Ballot Law Comm'n*, 10 Mass. App. Ct. 275, 279 (1980) (quoting *State ex rel. McNary v. Olcott*, 125 P. 303, 307 (Or. 1912)) ("[I]n the absence of evidence of intentional fraud or guilty knowledge on the part of the circulator, it would be an unjust rule to deprive the honest signer of his right to have his signature counted, merely because some disqualified person signed, or because some person, without the knowledge of the circulator, affixed a fictitious name, or gave a fictitious address."); *Fraternal Order of Police Lodge 35 v. Montgomery Cty.*, 80 A.3d 686, 697 (Md. 2013) (holding that "minor errors in the circulator affidavit will not invalidate petition signatures that are already certified by the appropriate administrative body").

[¶14] The Secretary of State acknowledged his office has never before invalidated all petitions from a single notary, and he cited no authority from any jurisdiction in which a class of documents relating to a notary had been invalidated as a result of notarial fraud or other misconduct. Our research, both inside and outside the election context, has revealed no precedent supporting invalidation of a class of documents notarized by an individual notary on the basis of imputing fraud relating to some of the documents. The Secretary of State applied the logical inference of the common law maxim "false in one thing, false in all things," often referred to in Latin as *falsus in uno, falsus in omnibus*. Of course, the Secretary of State found not one, but "several" of Lloyd's circulator affidavits to have been fraudulently notarized by Toe. But as detailed below, North Dakota law is contrary to application of the inference in this context, and the weight of authority from other jurisdictions is to reject application of this inference—even where there is *admitted* fraud as to several documents—and invalidate only those documents bearing indicia of fraud.

[¶15] The Secretary of State invalidated petition signatures on the basis of notary fraud he imputed from his inference of fraud in other petitions. Section 44-06.1-24, N.D.C.C., provides for when notarial acts are valid: "Except as

7

otherwise provided in this chapter, the failure of a notarial officer to perform the duties or meet the requirements specified in this chapter does not invalidate a notarial act performed by the notarial officer." Application of the common law maxim "false in one, false in all" to notarial acts in this context would be contrary to the Revised Uniform Law on Notarial Acts (RULNA). *See* N.D.C.C. §§ 1-01-06; 1-02-13. Imputing fraud to a facially valid notarial act from a separate act that may support an inference of notarial misconduct is impermissible—each notarial act must be challenged separately. N.D.C.C. § 44-06.1-24 [RULNA § 26] ("The validity of a notarial act under this chapter does not prevent an aggrieved person from seeking to invalidate the record or transaction that is the subject of the notarial act or from seeking other remedies based on other laws of this state or law of the United States."). The official comments to RULNA § 26 confirm a strong presumption of validity for facially valid notarial acts. So long as an individual is a notarial officer, "the failure of a notarial officer to perform the duties or to meet the requirements of this act does not invalidate the notarial act performed by the notarial officer. For example, a notarial act performed by a notary public whose assurance or surety bond may have expired or been cancelled is not invalidated." RULNA § 26 cmt. Although "a notarial act may be valid, the underlying record . . . may be set aside in appropriate legal proceedings." *Id.* Reliance on the validity of notarial acts is vital in many areas of law, including real estate transactions. Although fraud in one transaction is certainly relevant to a notary's credibility as to another transaction, it is not by itself sufficient to invalidate other acts by the same notary.

[¶16] In passing on the sufficiency of petitions, the "secretary of state shall conduct a representative random sampling of the signatures contained in the petitions . . . to determine the validity of the signatures." N.D.C.C. § 16.1-01-10. "Signatures determined by the secretary of state to be invalid may not be counted . . . ." *Id.* However, "in passing on the sufficiency of a petition, there is a presumption that each signature in the petition is the genuine signature of the person whose name it purports to be." *Zaiser*, 2012 ND 221, ¶ 21. The Secretary of State described the importance of the notary as follows: "If the notary does not faithfully execute his duties and cannot be trusted, it calls into question whether the circulator did make the required attestation, and in turn

8

calls into question the information contained on the attestation about the signers and signatures."

[¶17] In *Zaiser*, the Secretary of State rejected signatures on circulated petitions and determined an initiative measure to legalize medical marijuana did not qualify for placement on the ballot. 2012 ND 221, ¶ 1. The Secretary of State, through the Bureau of Criminal Investigation, had conducted personal interviews of six petition circulators. *Id.* at ¶ 21. All six circulators admitted to forging signatures on petitions they circulated, including one circulator who admitted that "every signature he turned in" was forged. *Id.* at ¶ 5. The other five circulators "indicated that [they] would not be able to identify any legitimate signatures [they] obtained with a level of confidence that [they] would be willing to sign a petition circulator affidavit indicating the signatures were legitimately obtained." *Id.* at ¶ 28. After the Secretary of State rejected all of the signatures on these petitions, the sponsoring committee challenged his rejection. *Id.* at ¶¶ 6-7. We concluded the Secretary of State "correctly determined the petitions with elector signatures forged by circulators and accompanied by false circulators' affidavits could not be used to calculate the number of elector signatures necessary to place the initiative measure on the [ballot]." *Id.* at ¶ 29. Thus, the disqualification of signatures was limited to those petitions where circulators admitted to forging signatures and the petitions were not supported by a supplemental circulator affidavit.

[¶18] The Pennsylvania Supreme Court considered and rejected a similar argument in *In re Farnese*, 17 A.3d 375 (Pa. 2011). In that case, "the objectors essentially made a 'pattern of fraud' or 'false-in-one, false-in-all' argument and asked the court to strike as invalid every signature page submitted by any circulator who had a page voluntarily withdrawn by the candidate. Similarly, the objectors argued that all the signature pages notarized by Jonathan J. Oriole had to be stricken because Mr. Oriole had falsely notarized a withdrawn page." *Id.* at 384 (Castille, C.J., concurring); *id.* at 388 (Saylor, J., concurring) ("I also agree with Mr. Chief Justice Castille, that Appellants' novel false-in-one-false-in-all theory, as presented to the Commonwealth Court, was appropriately rejected by that court."); *id.* at 390 (Eakin, J., joined by Baer, J., concurring) ("I continue to agree that a 'false in one, false in all' principle

9

should be rejected in these cases . . . fraud should not be a presumptive total disqualification, but a permissible consideration.").

[¶19] In *Cunningham v. Schaeflein*, the Appellate Court of Illinois considered a pattern of violations involving two circulators who "regularly failed to personally appear before notary Lisa Hwang when swearing their petition sheets" and a request by the objecting parties to invalidate all petitions associated with the notary and the two circulators. 969 N.E.2d 861, 865 (Ill. App. Ct. 2012). Both circulators testified that they had submitted signed circulator affidavits without personally appearing before the notary. *Id.* at 866-67. The notary also testified that she would sometimes notarize petitions of individuals who had not appeared before her. *Id.* at 867. In addition to this testimony, a certified forensic document examiner provided expert testimony that many of the signatures submitted by the two circulators "bore characteristics of common authorship." *Id.* The hearing officer found no basis to invalidate all petitions notarized by Hwang, and the electoral board adopted the hearing officer's findings. *Id.* On appeal, the court concluded that the testimony called into question all sheets signed by the two circulators and "cast[] a cloud over all sheets notarized by Hwang, even if the evidence does not establish that every instance of swearing was improper" and struck only the petition sheets circulated by the two circulators. *Id.* at 876-77.

[¶20] In *Raila v. Cook Cty. Officers Electoral Bd.*, the Board adopted the hearing officer's finding that "ten notaries and 12 circulators engaged in an intentional pattern of fraud" and struck all sheets notarized by the ten notaries and all sheets circulated by the 12 circulators. 2018 IL App (1st) 180400-U, 2018 WL 1365513, at ¶¶ 25-26. On appeal, the only issue was the invalidation of signatures on the basis of a pattern of notary and circulator fraud, consisting of "numerous instances of Raila's circulators having mailed in petition sheets to the campaign that were either unsigned or signed but unnotarized, and that those petition sheets were subsequently signed by someone other than the original circulator." *Id.* at ¶¶ 6, 8. The hearing officer received affidavits from mail-in circulators who stated they returned signed but unnotarized petitions that were later notarized. *Id.* at ¶ 40. Three circulators testified at the evidentiary hearing that a total of 38 petition sheets were notarized without

their having appeared before a notary. *Id.* A fourth was barred from testifying but provided affidavits supporting the pattern as to 121 additional sheets. *Id.* at ¶¶ 15, 40. Beyond these 159 sheets, the Board struck sheets containing over 7,800 valid signatures on the basis of notary misconduct. *Id.* at ¶ 41. The court concluded:

> Furthermore, there were no admissions by any of the notaries involved that they intentionally notarized sheets without the circulator present. There was no evidence from any witness who observed notaries notarizing petition sheets without the named circulator present. There was no evidence from any witness that anyone ever instructed a notary to notarize petition sheets without the named circulator present. While there was some evidence that certain notaries, including Raila herself, notarized sheets without the circulator present, that evidence simply does not rise to level of "clear and convincing" evidence of a pattern of fraud, and is certainly not sufficient evidence to warrant striking each and every sheet notarized by ten of the notaries.

*Id.*

[¶21] We find these cases persuasive in rejecting wholesale invalidation of signatures for irregularities by the notary. *See also Zaiser*, 2012 ND 221, ¶¶ 5, 28-29 (rejecting signatures that were either admitted to be forged or which were not supported by a supplemental circulator affidavit). We conclude the Secretary of State misapplied the law by imputing fraud from several inconsistent signatures of circulators on several affidavits sworn to before Toe and, as a result, disqualifying all 15,740 signatures on 751 petitions notarized by Toe.

### III

[¶22] The Secretary of State's decision to invalidate all signatures on petitions having circulator oaths notarized by Zeph Toe was a misapplication of law. The Secretary of State's spreadsheet of signatures notarized by Zeph Toe indicates 15,740 signatures were disqualified solely because Toe notarized those petitions and were otherwise indicated to be "valid signatures." Setting aside the 1,043 signatures directly connected to the signature inconsistencies found

11

by the Secretary of State, the remaining 14,697 signatures are sufficient when added to other signatures found valid by the Secretary of State to qualify the measure for the ballot.

[¶23] We need not address the Petitioners' additional arguments that the Secretary of State erred in invalidating signatures for violating name and address requirements and the pay-per-signature ban, N.D.C.C. § 16.1-01-12(1)(j), because they are unnecessary to our decision. We also need not address the constitutional challenge to N.D.C.C. § 16.1-01-12(1)(j). *See Poochigian v. City of Grand Forks*, 2018 ND 144, ¶ 10, 912 N.W.2d 344 (noting that "courts will not give advisory opinions on abstract legal questions, and an action will be dismissed if there is no actual controversy left to be determined and the issues have become moot or academic"). Accordingly, we decline to address those issues.

[¶24] We grant the Committee's petition and issue a writ of mandamus requiring the Secretary of State to place the Term Limits Initiative on the November 8, 2022, general election ballot.

[¶25] Jon J. Jensen, C.J.
Lisa Fair McEvers
Jerod E. Tufte
Allan L. Schmalenberger, S.J.
William A. Neumann, S.J.


[¶26] The Honorable William A. Neumann and the Honorable Allan L. Schmalenberger, Surrogate Judges, sitting in place of VandeWalle, J., and Crothers, J., disqualified.